[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 555.]

THE STATE OF OHIO, APPELLEE, *v.* OTTE, APPELLANT.

[Cite as *State v. Otte*, 1996-Ohio-108.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-2622—Submitted October 11, 1995—Decided February 21, 1996.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 64617.

———————————

{¶ 1} Gary Wayne Otte ("Otte") appeals from his convictions for aggravated murder, aggravated robbery and aggravated burglary and his death sentence.

{¶ 2} On February 11, 1992, Otte stole his grandfather's red 1962 Chevrolet Impala and .22 revolver and left Terre Haute, Indiana. He also stole two credit cards belonging to his uncle and aunt. Otte arrived in Parma, Ohio the next day and tried to use the stolen cards in local stores, but they were confiscated.

{¶ 3} Otte next drove to see his friend Mike Carroll ("Carroll"). Carroll lived with his fiancee and Jerry "J.J." Cline ("J.J.") in the Pleasant Lake apartment complex in Parma.

{¶ 4} After that Otte drove to Gypsy and Rob's, a Cleveland bar, where he found J.J. Otte asked J.J. "if he was still robbing people." J.J. said he planned to "hit" two people at Pleasant Lake. One was a woman in her thirties with a Visa gold card; she lived alone "one building over" from J.J. and Carroll. The other was "an old man that lives diagonally from [Carroll's] apartment that is a drunk and has lots of money."

{¶ 5} That evening, Otte returned to Pleasant Lake alone. He went to Carroll's apartment, but nobody was home. He then knocked on the door of Mary Ann Campangna ("Campangna"), who lived next to Carroll and across the hall from Robert Wasikowski. Otte claimed his car had overheated, said he was looking

for Carroll, and asked for oil. Campangna told him she didn't have any, and Otte left.

{¶ 6} Otte saw Wasikowski drive into the parking lot and thought that "that was the man" J.J. had described. Otte came out and asked Wasikowski for some oil, telling him the same story about his car overheating. As they spoke, Otte noticed that Wasikowski had been drinking. Wasikowski drove Otte to a gas station to buy oil.

{¶ 7} When they returned, Otte asked to use Wasikowski's phone; after some hesitation, Wasikowski agreed. Otte followed Wasikowski into his apartment. Looking through her peephole, Campangna found this "very strange," so she continued to watch Wasikowski's door. Six or seven minutes later, Campangna heard "a very loud crack, cracking sound."

{¶ 8} Inside the apartment, Otte pretended to make a phone call, then "tried to stall for time." Finally, Wasikowski asked Otte to leave. Otte went to the door, opened it, then slammed it shut and drew a gun. Wasikowski offered Otte $10 from his pocket. Otte pulled the trigger anyway, but the gun wouldn't fire. Wasikowski asked, "[I]t isn't loaded, is it[?]" Otte then fired the gun at Wasikowski's head. This time, it went off. Wasikowski fell to the floor, gasping and begging for help. Otte found this "the most horrible sight that I have ever seen"; nonetheless, he turned up the volume on the TV and went through Wasikowski's pants pocket, took out his wallet and took his cash, about $413. Otte searched for more money, but found only some fifty-cent pieces in the bedroom. He considered shooting himself, "but something told me not to," so he stole the fifty-cent pieces and left through the sliding glass patio door.

{¶ 9} Otte then returned to Gypsy and Rob's, where he paid an $80 debt, played pool, drank, and took drugs. At 2:30 a.m., he left the bar, but continued to "party" until 10:00 or 10:30 a.m., when he checked into a hotel and slept until 5:00 p.m.

{¶ 10} When Wasikowski failed to report for work on February 13, his employer called the Parma police. An officer entered the apartment and found Wasikowski dead. Robert Challener, the chief deputy county coroner, later performed an autopsy. He found that Wasikowski died from a gunshot to the head fired from less than two feet away.

{¶ 11} Meanwhile, Parma police investigated the murder. Capt. Joseph Bistricky ("Bistricky') interviewed Mary Ann Campangna, who described the man she had seen as "a white male, early 20's, six feet, thin to medium build, with blondish-brown hair, and a mustache." She suggested that Mike Carroll might know him.

{¶ 12} Around 1:30 p.m., Bistricky interviewed Carroll, who said he knew the person Campangna had seen; his name was Gary, he was from Indiana, and he was driving his grandfather's car, a red 1962 Impala in good condition. Carroll's description of "Gary" matched Campangna's. Carroll promised to call police if he found out more about Gary's identity or location. Later that day Carroll told the police Gary would be at Gypsy and Rob's around 7:30 p.m.

{¶ 13} On the evening of February 13, Otte went back to Pleasant Lake to rob Sharon Kostura. Otte knocked on her door; when she answered, he drew a .22 revolver and shoved his way in. He closed and locked the door. Kostura screamed and Otte shot her in the head. He stole about $45 from her purse, took her car keys and checkbook, and left through the patio door. Police later found Otte's fingerprint on that door.

{¶ 14} After dinner, Otte returned to Gypsy and Rob's. He left with Carroll, J.J., and someone known as "Buster." They "smoked dope" in the Impala, then visited someone called "Patty." After leaving Patty's house, Otte dropped off J.J. and Buster near the bar.

{¶ 15} Otte then drove past several police officers near Gypsy and Rob's. Because Carroll had told Capt. Bistricky that Otte would be at the bar that night,

the officers were waiting for Otte.  They pulled him over and ordered him to shut off the engine and throw out the keys.  Carroll told the officers, "The guns are in the trunk."  Officers opened the trunk and found a .22 caliber revolver and a .25 caliber semi-automatic pistol.  The officers began an inventory search of the car but because of bad weather and a gathering crowd, Bistricky ordered the car towed, and the search was completed at the police garage.

{¶ 16} In the glove compartment, police found Kostura's checkbook,  a set of Hyundai car keys, and a box of .22 caliber live shells.   In the passenger compartment, they found ammunition for the .25 caliber gun and a pillow with a red stain.   A detective documented the items found on an inventory form.

{¶ 17} Because Kostura had not reported her checkbook stolen, officers went to her apartment where they found her still alive. Kostura was taken to the hospital and lived eight days,  until February 21.  Dr. Challener found that the gunshot wound to her head killed her.

{¶ 18} Det. John Bomba interrogated Otte within an hour of his arrest on February 13.   Otte denied going to the Pleasant Lake Apartments on February 12 or 13.  He claimed he had no idea how Kostura's checkbook got into the car and "never even saw the guns until the police said they were in the trunk."

{¶ 19} On the afternoon of February 14, Det. Robert DeSimone interrogated Otte. Otte confessed to shooting and robbing Wasikowski and Kostura. On February 16, Otte signed a confession.  On February 20, Otte asked to speak with DeSimone; he corrected part of his February 16 statement and answered questions.

{¶ 20} Otte was indicted for aggravated murder under both R.C. 2903.01(A) and 2903.01(B) as to each victim  (Counts 1, 2, 6, and 7)  Each count carried a felony-murder specification, R.C. 2929.04(A)(7); the two counts involving Kostura's murder also carried a multiple murder specification, R.C. 2929.04(A)(5). Otte was also charged with two counts each of aggravated burglary, kidnapping, and aggravated robbery (Counts 3 through 5, 10 through 12).  Counts

1 through 5 and 8 through 12 all carried a firearm specification. Counts 6 and 7 (receiving stolen property) were later dismissed.

{¶ 21} A three-judge panel acquitted Otte of kidnapping (Counts 4 and 7) and convicted him of all other counts and specifications. The panel sentenced Otte to death. The court of appeals affirmed.

{¶ 22} This cause is now before the court upon an appeal as of right.

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *Karen L. Johnson*, Assistant Prosecuting Attorney, for appellee.

*Zukerman & Associates* and *Larry W. Zukerman*, for appellant.

_____

**COOK, J.**

{¶ 23} We have reviewed Otte's seven propositions of law, independently weighed the aggravating circumstances against the mitigating factors and evaluated the proportionality and appropriateness of the death penalty. For the following reasons, we affirm the judgment of the court of appeals and uphold the convictions and death sentence.

Proposition of Law One—Car Search

{¶ 24} In his first proposition of law, Otte contends that the trial court should have suppressed the evidence (guns, ammunition, pillow with red stain, and checkbook) found in the police search of the 1962 Impala. Otte lacks standing to challenge the search of the Impala because he admitted that he had stolen the car from his grandfather. A car thief has no legitimate expectation of privacy in a stolen car and therefore lacks standing to challenge its search. *Rakas v. Illinois* (1978), 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 395.

{¶ 25} Otte does, however, have standing to argue that the items in the car should have been suppressed as "fruits of the poisonous tree" because the police lacked probable cause to arrest him.

**{¶ 26}** An arrest without a warrant is constitutionally invalid unless the arresting officer had probable cause to make the arrest at that time. *State v. Timson* (1974), 38 Ohio St.2d 122, 67 O.O.2d 140, 311 N.E.2d 16, paragraph one of the syllabus. Probable cause exists when the arresting officer has sufficient information from a reasonably trustworthy source to warrant a prudent person in believing that the suspect has committed or was committing the offense. *Id.*, citing *State v. Fultz* (1968), 13 Ohio St.2d 79, 42 O.O.2d 259, 234 N.E.2d 593.

**{¶ 27}** Contrary to Otte's assertion, there was probable cause to arrest in this case. The police knew that Mary Ann Campangna had seen a stranger enter Wasikowski's apartment on February 12. She described him and sent police to Mike Carroll for further information. She also told them that she heard a loud sound, that she never saw him leave the apartment, and that the man had used Carroll's name. Campangna was an average citizen, not an "informant from the criminal milieu." 1 LaFave, Search and Seizure (1987) 611, Section 3.3. Police could therefore "assume that they [were] dealing with a credible person * * * ." Id. at 718, Section 3.4(a).

**{¶ 28}** Carroll identified the man as "Gary" from Indiana and described the distinctive car he drove, a red 1962 Chevrolet Impala. Carroll's description of "Gary" matched Campangna's description of the man who entered Wasikowski's apartment. Carroll later told police that Gary would be at Gypsy and Rob's around 7:30 p.m. Officers watching the bar did not see Otte or the car, but around 8:00 p.m., they received word from Carroll's fiancee that Carroll and Otte had left the bar and would return around 8:30 p.m. The officers resumed their surveillance, saw the red 1962 Impala, and stopped it.

**{¶ 29}** The police had reason to believe that the information given by Carroll was reliable. Carroll had known Otte for a month and a half, knew where he came from, knew that he frequented Gypsy and Rob's, and described his distinctive car. Moreover, since Otte used Carroll's name when speaking to

Campangna, police had independent reason to believe that Otte and Carroll knew each other.

{¶ 30} Carroll's information was confirmed when the 1962 Chevrolet showed up near the bar at 8:30 p.m., as Carroll's fiancee (presumably passing along information from Carroll) told police. Familiarity with a person's itinerary suggests "inside information," and reliability. *Alabama v. White* (1990), 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301, 310.

{¶ 31} Police found Wasikowski's body with a gunshot wound. Campangna's presumptively reliable information strongly indicated that the man she saw was the person who shot Wasikowski. Since Otte fit Campangna's description, police could reasonably believe that he was the killer. When police saw a red 1962 Impala with Indiana plates near Gypsy and Rob's that supported Carroll's reliability, and they could stop the car on the justifiable assumption that Otte was driving it. On stopping the car, the officers saw that Otte matched Campangna's description and Otte's passenger, Carroll, stated that "the guns are in the trunk." These facts amount to probable cause to stop and arrest Otte.

{¶ 32} As to Otte's claim that the items found in the Impala should be suppressed, even if Otte does have standing to challenge the search of the vehicle, we find that the items were properly seized under three well-established exceptions to the warrant requirement. See *State v. Brown* (1992), 63 Ohio St.3d 349, 350, 588 N.E.2d 113, 114. The guns could be retrieved from the trunk because Mike Carroll's statement gave the police probable cause to believe that the guns (contraband) were in the trunk. *Carroll v. United States* (1925), 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. The ammunition and pillow could be taken from the passenger compartment because they were in the officers' plain view. *Texas v. Brown* (1983), 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502. And Kostura's checkbook and the keys could be retrieved from the glove box incident to the

inventory search of the car.[1] *South Dakota v. Opperman* (1976), 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000;   *State v. Hathman* (1992), 65 Ohio St.3d 403, 604 N.E.2d 743.

{¶ 33} Accordingly, Otte's first proposition of law is overruled.

Proposition of Law Two--Suppression of Statements

{¶ 34} In his second proposition of law, Otte contends that his confession statements to the police on February 14 and 16 should have been suppressed because the state failed to show they were voluntary.

{¶ 35} On February 13, the date he was arrested, Otte was questioned by Det. Bomba.  Bomba read Otte his *Miranda* rights, which Otte indicated he understood.  Otte denied any involvement in the murders and claimed he hadn't been at the Pleasant Lake apartment complex on February 12 and 13.

{¶ 36} The next day, February 14, Det. DeSimone questioned Otte. DeSimone testified that Otte seemed calm and composed, was not shaking, showed no withdrawal symptoms, did not complain of  illness, and did not appear to be under the influence of drugs or alcohol.   DeSimone read Otte his *Miranda* rights, Otte indicated he understood his rights, then waived them.  Otte next made an oral confession, which DeSimone tape-recorded.   DeSimone testified that he made no promises or threats.  After confessing, Otte asked DeSimone "what he could get"; DeSimone told him he could get the death penalty, but never said he could avoid it by confessing.

{¶ 37} On February 16, DeSimone questioned Otte again after reading him the *Miranda* warnings and getting a written waiver.  Otte did not appear to be under the influence.  DeSimone wrote Otte's statement down, and Otte signed it.   This statement was consistent with his February 14 confession.  On February 20, Otte

---

1.  There was testimony in this case that the police department followed its inventory policy as required by *Opperman* and <u>Hathman</u>, *supra*<u>.</u>

asked to speak to DeSimone again. DeSimone again advised him of his rights; Otte waived them and made a statement clarifying his February 16 confession.

{¶ 38} At the suppression hearing, Otte testified that he had consumed "a half gallon to a gallon" of whiskey and $300-$400 worth of crack cocaine during the twenty-four hours preceding his February 13 arrest; on the day of the arrest alone, he claimed he had "three-fourths of a fifth" of whiskey, "a couple [of] joints," and $75 to $125 worth of crack, some of which he smoked ten to fifteen minutes before his arrest.

{¶ 39} Otte testified that, during the February 14 interrogation, he admitted that "I did the crime" and asked "what was I going to get. And they said the death penalty." According to Otte, DeSimone said that they had enough evidence to arraign him, but if Otte helped the detectives, "they would help me out and I wouldn't get the death penalty."

{¶ 40} Otte conceded that, during the February 14 interrogation, he was sober, but testified that he was in withdrawal, had blurred vision, and could not "think through what I was actually saying." He claimed he was "shaky from drinking," but also said he was "shaky because of what I was arrested for."

{¶ 41} Otte testified that on February 15, he vomited blood and "couldn't stop shaking." Police took him to a hospital. A doctor diagnosed withdrawal, and Otte was given medication. Otte testified that hospital personnel told him he was having "DT's" (delirium tremens). However, an emergency room report introduced by Otte himself said that he "denie[d] any vomiting or bleeding" and was not undergoing delirium tremens.

{¶ 42} Otte testified that he confessed because, "first of all I felt bad." He added that he also confessed because DeSimone told him he could avoid the death penalty, and that he "didn't understand what was actually going on."

{¶ 43} Otte claims the state failed to prove his waivers and statements were voluntary. A suspect's decision to waive his privilege against self-incrimination is

made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484; *State v. Dailey* (1990), 53 Ohio St.3d 88, 559 N.E.2d 459, paragraph two of the syllabus.

{¶ 44} In support of his claim that his confessions were not voluntary, Otte points to his alleged intoxication, but we have only Otte's word for the amount of whiskey and drugs he consumed on February 13; Det. Bomba testified that Otte did not appear to be under the influence that night.

{¶ 45} Otte claims he was suffering from withdrawal on February 14, but DeSimone saw no symptoms, and Otte answered "no" when asked during the February 14 confession if he was presently under the influence of alcohol or drugs. Otte claims DeSimone promised to save him from the death penalty, but DeSimone denied that. Moreover, Otte's claim of physical deprivation or mistreatment is meritless. See *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. His own testimony shows that police took him to the hospital when he told them that he was sick. Nor do the "length, intensity, and frequency of interrogation" suggest involuntariness. *Id.* Otte was interrogated for two hours on the night of the arrest, when he denied guilt. He was not interrogated again until 4:00 p.m. the next day, and then for less than an hour. He was not interrogated again until 9:00 a.m., February 16, two days later. He did not speak to police again until February 20, in a brief conversation that he initiated.

{¶ 46} Otte's second proposition of law lacks merit.

Proposition of Law Seven—Discovery Violation

{¶ 47} In his seventh proposition of law, Otte argues that his taped confession should have been excluded because the state failed to give it to the defense in discovery. This issue was first raised on June 25, 1992, at the hearing on Otte's motion to suppress statements. Det. DeSimone identified the tape, and

the prosecutor offered it as a motion exhibit. The defense objected because the tape "was not provided at discovery." The prosecutor said that he had just received it that day and had not known of it before. When questioned by the judge, defense counsel stated, "I have no firsthand information to suggest he is not acting in good faith." The judge overruled the motion to suppress the tape. On September 16, 1992, eighty-three days later, the guilt phase began. When the prosecution introduced the tape, defense counsel objected but stated no grounds. The objection was overruled and the tape was played.

{¶ 48} Otte argues that the trial judge should have excluded the tape because the state failed to give him the tape as required by Crim.R. 16(B)(1)(a)(i). "Crim. R. 16(E)(3) * * * permits a trial court to exercise discretion in determining the appropriate sanction for a discovery violation." *State v. Scudder* (1994), 71 Ohio St.3d 263, 268, 643 N.E.2d 524, 529. Although exclusion is an available sanction, a trial court is not required to impose that sanction. *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 487, 453 N.E.2d 689, 691. The court does not abuse its discretion in admitting evidence undisclosed in discovery unless the record shows that the prosecutor's discovery violation was willful, that foreknowledge would have benefited the accused in preparing his defense, or that the accused was unfairly prejudiced. See*, e.g., Scudder*, *supra*, at 269, 643 N.E.2d at 529-530; *State v. Wiles* (1991), 59 Ohio St.3d 71, 79, 571 N.E.2d 97, 110.

{¶ 49} First, there is no evidence of a willful discovery violation. The prosecutor revealed the tape the day he received it. Second, the defense knew about the tape eighty-three days before the trial began. Third, Otte does not explain how he was unfairly prejudiced by the alleged discovery violation. Otte knew of the statement's content, since it was his own statement. Furthermore, nothing in the record suggests that the defense was not allowed to inspect and copy the tape during the eighty-three day period. Moreover, Otte failed to make a specific objection at trial. Under Evid.R. 103(A)(1), error may not be based on a ruling to admit

evidence unless the opponent "stat[es] the specific ground of the objection, if the specific ground was not apparent from the context ***." The trial court did not abuse its discretion by admitting the tape.

{¶ 50} Accordingly, Otte's seventh proposition of law is overruled.

Proposition of Law Five—Intoxication/Purpose to Kill

{¶ 51} In his fifth proposition of law Otte challenges the sufficiency of the evidence. Specifically, he claims that intoxication rendered him incapable of forming the specific purpose to kill Wasikowski and Kostura. The relevant inquiry when reviewing the sufficiency of the evidence on an essential element is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found this element beyond a reasonable doubt. See *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573.

{¶ 52} Voluntary intoxication is not a defense, but where specific intent is a necessary element of the crime charged, the fact of intoxication may be shown to negate this element if the intoxication is such as to preclude the formation of such intent. *State v. Fox* (1981), 68 Ohio St.2d 53, 55, 22 O.O.3d 259, 260, 428 N.E.2d 410, 411-412. Only where the defendant was "'so intoxicated as to be mentally unable to intend anything'" will his intoxication create a reasonable doubt as to his ability to form the specific intent essential to the charged felony. *State v. Jackson* (1972), 32 Ohio St.2d 203, 206, 61 O.O.2d 433, 434, 291 N.E.2d 432, 433, quoting Wertheimer, The Diminished Capacity Defense to Felony-Murder (1971), 23 Stanford L.Rev. 799, 805. As discussed below, the evidence was sufficient to permit a finding of intent as to each murder, despite some evidence of intoxication.

*Wasikowski Murder*

{¶ 53} Otte appears to claim that he was intoxicated by "mind-numbing amounts" of drugs and alcohol before *both* murders. Yet Otte's confessions make almost no reference to using drugs *before* Wasikowski's murder, in sharp contrast

to his detailed account of his drug and alcohol use between the two murders. Otte did say, in his February 14 confession, that he had been using crack "constantly for the last two weeks. * * * This is the first time that I've actually came [*sic*] down." But there is only one *specific* mention of using drugs before Wasikowski's murder: Otte's February 16 confession states that on February 12, he "matched a joint" with J.J. There was no evidence that Otte drank before killing Wasikowski.

{¶ 54} Moreover, Otte pulled the trigger twice on Wasikowski (the gun misfired the first time). He fired from less than two feet away and shot Wasikowski in the head. Finally, he evidenced clearheadedness by concocting a story to tell Wasikowski, turning up the TV to drown out Wasikowski's cries, and leaving through the patio door. Thus, even if Otte was intoxicated, the trial court still could reasonably find intent to kill.

*Kostura Murder*

{¶ 55} Otte told Det. DeSimone that he consumed large amounts of whiskey and crack between the murders. However, the three-judge panel did not have to believe these self-serving claims. Not only is intoxication "easily simulated," *Nichols v. State* (1858), 8 Ohio St. 435, 439, it is also easily claimed after the fact.

{¶ 56} Otte told DeSimone on February 14 that he shot Kostura for a specific reason: "because she screamed. And I got paranoid." Moreover, Otte shot Kostura in the head, an indication of his intent to kill her, and he again showed clearheadedness by slipping out through the patio door.

{¶ 57} Based on these facts the panel could reasonably find that Otte did purposely kill Wasikowski and Kostura (R.C. 2903.01). Otte's fifth proposition of law is overruled.

Proposition of Law Six—Ineffective Assistance

{¶ 58} In his sixth proposition of law Otte makes four claims of ineffective assistance of trial counsel. Counsel's performance will not be deemed ineffective unless Otte shows that it "fell below an objective standard of reasonableness" and

prejudiced him. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct.2d 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 59} First, Otte complains that counsel failed to cross-examine five of the state's seven witnesses (Dets. Bomba, Monnolly, Bunyak, and Lisy, and Dr. Challener). Otte has not shown that counsel's decision to forgo cross-examination of these witnesses fell below an objective standard of reasonable representation. Trial counsel need not cross-examine every witness; indeed, doing so can backfire. See, *e.g.*, Younger, The Advocate's Deskbook (1988) 290; McCloskey & Schoenberg, Criminal Law Deskbook (1995) 10-33 to 10-35, Section 17.05. The strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment, see *State v. Brown* (1988), 38 Ohio St.3d 305, 319, 528 N.E.2d 523, 540, and the record does not show here that counsel's decision was unreasonable. Furthermore, Otte has not shown how he was prejudiced by counsel's decision not to cross-examine these witnesses.

{¶ 60} Second, Otte complains that counsel stipulated to the identification of his fingerprint in Kostura's apartment. He contends that counsel should have "attempt[ed] to challenge the procedures employed, or the individuals involved in the analysis, so as to raise a doubt as to its accuracy." He also claims the print was "the only tangible evidence linking [him] to the murder scene."

{¶ 61} Again, Otte has not shown prejudice. There was additional evidence that Otte murdered Kostura, including Otte's confession and the police's finding Kostura's checkbook in the glove compartment of the car Otte was driving when arrested. Otte has not shown a reasonable probability that, but for the stipulation, the result of the trial would have been different.

{¶ 62} Nor has Otte shown that the stipulation resulted from deficient performance. For all we know, the fingerprint identification was unassailable. Counsel's conduct is strongly presumed to fall within the wide range of reasonable

professional assistance. *Strickland*, *supra*, 466 U.S. at 689, 104 S.Ct at 2065, 80 L.Ed.2d at 694.

{¶ 63} Third, Otte complains that counsel failed to introduce any evidence. Otte suggests that Carroll and J.J. "should have been called * * * to challenge their involvement in this entire matter." Nothing in the record suggests that Carroll had any part in these crimes. As for J.J., Otte's own confession showed that he was only peripherally involved. (He told Otte about the potential of Wasikowski and Kostura as robbery victims.) Otte's claim of prejudice comes to no more than vague speculation, which neither shows prejudice nor overcomes the presumption that counsel acted competently.

{¶ 64} Fourth, Otte claims counsel did not adequately investigate mitigation. He bases this claim on counsel's finding "only" three witnesses in the two-week (actually eighteen-day) period between the guilt and penalty phases. It is possible that counsel started preparing for mitigation before trial; the penalty phase began more than six months after counsel's appointment to the case.

{¶ 65} Actually, counsel presented substantial mitigating evidence. Dr. Sandra McPherson, a forensic and clinical psychologist, testified that Otte suffers from depression, alcoholism, and "poly-substance abuse" and "has diminished capacity for impulse control." Otte's parents testified about his sad childhood, including several suicide attempts. The defense also introduced letters from Otte's brothers and sisters pleading for his life.

{¶ 66} Otte suggests that a more thorough investigation might have yielded more mitigating evidence, but the record does not show that counsel failed to investigate reasonably. "It may be * * * that counsel conducted a diligent investigation, but was simply unable to find [more] substantial mitigating evidence." *State v. Hutton* (1990), 53 Ohio St.3d 36, 42, 559 N.E.2d 432, 441.

{¶ 67} Otte has shown neither deficient performance nor prejudice. His sixth proposition of law is overruled.

Propositions of Law Three and Four—Sentencing Opinion

{¶ 68} In propositions of law three and four Otte challenges the three-judge panel's weighing of aggravation against mitigation. In his third proposition Otte claims that the panel gave insufficient weight to his voluntary intoxication and "chronic alcoholism." This court will independently consider, as part of its own sentencing review, what weight Otte's intoxication and alcoholism deserve. See *State v. Lott* (1990), 51 Ohio St.3d 160, 172, 555 N.E.2d 293, 305-306. Our independent review can correct any flaws in the trial court's opinion. See *State v. Lewis* (1993), 67 Ohio St.3d 200, 204, 616 N.E.2d 921, 925.

{¶ 69} In his fourth proposition of law, Otte argues that the sentencing panel "impermissibly required proof of a psychosis as a mitigating factor pursuant to R.C. 2929.04(B)(3), and as a result, failed to consider appellant's chronic alcoholism as a mitigating factor pursuant to R.C. 2929.04(B)(3)." The trial court stated in its sentencing opinion that it "considered the mitigating factors, including * * * the testimony of a mitigation expert [Dr. Sandra McPherson], who stated that Mr. Otte had no psychosis that she knew of or could find." Although R.C. 2929.04(B)(3) does not require a finding of "psychosis," the word "psychosis" can be a "[g]eneric term for any of the so-called insanities," or for a "severe emotional illness." Stedman's Medical Dictionary (25 Ed. 1990) 1286; 3 Schmidt, Attorneys' Dictionary of Medicine (1995) ,at P-366, definitions 2 and 3. "Psychosis" also has a more narrow technical meaning, *id*. at definition 1, but Otte's expert did not define the word, so the trial court may have understood it to mean simply that Otte was not mentally ill. In any event, the trial court did not suggest that a "psychosis," in the narrow sense of that word, is a prerequisite to finding a "mental disease or defect" under R.C. 2929.04(B)(3). Otte argues that the trial court should have found the (B)(3) mitigating factor to exist, based on his alcoholism and substance abuse. However, contrary to Otte's suggestion, his expert never testified that his substance abuse was a mental disease or defect.

**{¶ 70}** Otte's claim that the panel "dismissed" evidence of his alcoholism and drug abuse is also wrong. The sentencing opinion specifically says the court considered Otte's "drug addiction and history" as a mitigating factor. The court did not say whether it considered that factor under R.C. 2929.04(B)(3) (mental disease) or (B)(7) (catchall). However, as long as the court considered the mitigating potential of addiction, it does not matter under which statutory category it was considered.

**{¶ 71}** Otte's third and fourth propositions of law lack merit and are overruled.

Independent Review

**{¶ 72}** We now turn to our independent assessment of whether the aggravating circumstances outweigh the mitigating factors raised by Otte.

*Aggravating Circumstances*

**{¶ 73}** Wasikowski's murder has only one aggravating circumstance: that Otte committed the murder while committing aggravated robbery and aggravated burglary (felony-murder, R.C. 2929.04[A][7]). Kostura's murder has two: the felony-murder circumstance and the multiple murder circumstance (R.C. 2929.04[A][5]).

*Mitigating Factors*

**{¶ 74}** Against these aggravating circumstances Otte asks us to consider the following mitigating factors.

**{¶ 75}** Otte was twenty years old at the time of the murders. Youth is a mitigating factor, R.C. 2929.04(B)(4); however, we find it of little weight in this case. See, *e.g., State v. Hill* (1992), 64 Ohio St.3d 313, 335, 595 N.E.2d 884, 901 (age eighteen); *State v. Glenn* (1986), 28 Ohio St.3d 451, 461- 462, 28 OBR 501, 510, 504 N.E.2d 701, 711 (age twenty).

**{¶ 76}** Otte's main mitigation witness, Dr. Sandra McPherson, a clinical psychologist, testified that Otte suffers from depression, immaturity, and alienation,

and that he has an IQ in the bottom fifteen percent of the population. She also testified that Otte has "diminished capacity for impulse control," in that he does not think before he acts and he doesn't see the connection between his acts and their consequences. Otte is unable to deal with complexity, so he oversimplifies and reacts emotionally. McPherson did not attribute these problems to mental disease or defect.

{¶ 77} McPherson also discussed Otte's childhood. She testified that as a child, Otte suffered from hyperactivity, stuttering, and extreme clumsiness. He also had impaired hearing as a result of complications from childhood ear infections. Because of his hearing problems Otte developed a learning disability and deficient verbal skills, and the other children made fun of him. Otte tried to kill himself several times between age fourteen and age twenty.

{¶ 78} Otte's parents blamed his problems on low self-esteem resulting from childhood difficulties. McPherson found no dysfunction in Otte's upbringing. According to McPherson, Otte's family was "conventional" and "middle class." Otte's parents sent him to counseling and drug rehabilitation programs, but their efforts failed and he spent his adolescence in and out of institutions.

{¶ 79} We consider Otte's psychological and childhood problems under the "catchall" mitigation category (R.C. 2929.04[B][7]) because there has been no showing that Otte suffered from a mental disease or defect at the time of the murders (R.C. 2929.04[B][3]). We give very little weight to Otte's psychological problems and even less to his childhood difficulties. Otte had the advantages of a middle-class upbringing and loving parents who tried to help him.

{¶ 80} At the age of ten Otte began using drugs and alcohol. By fourteen or fifteen he was engaged in poly-substance abuse and major alcohol use. Otte claims his intoxication during the murders is a mitigating factor. In certain circumstances voluntary intoxication can constitute a mitigating factor, albeit a

weak one. *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710, 714.

{¶ 81} Otte exhibited some remorse when he considered killing himself after murdering Wasikowski, and when he wept during a psychological exam. Remorse, however, deserves little weight in mitigation. *State v. Post* (1987), 32 Ohio St.3d 380, 394, 513 N.E.2d 754, 768. Otte's sincerity is doubtful. He acted callously after shooting Wasikowski by searching his pockets and apartment for money, and he came back the next day to shoot Kostura and he lied to the police after his arrest.

{¶ 82} We now weigh these mitigating factors against the aggravating circumstance(s) in each murder. "When a capital defendant is convicted of more than one count of aggravated murder, * * * [o]nly the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. Based on the foregoing, we find that the aggravating circumstance (felony-murder) in the Wasikowski murder outweighs the mitigating factors and the aggravating circumstances (felony-murder and multiple murder) in the Kostura murder outweigh the mitigating factors.

*Proportionality*

{¶ 83} We conclude that the death penalty is appropriate and proportionate for both convictions. R.C. 2929.05(A). As to the conviction for Kostura's murder, this court has previously upheld the death sentence in cases involving robbery-murder and multiple murder. See, *e.g.*, *State v. Hicks* (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030; *State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274. We have also upheld the death sentence when there was evidence of intoxication or remorse. *Hicks*, *supra*; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212. The death penalty for Wasikowski's murder is proportionate to death penalties affirmed for cases involving robbery-murder or burglary-murder. See *State v.*

*Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; and *State v. Campbell* (1994), 69 Ohio St.3d 38, 630 N.E.2d 339.

{¶ **84**} Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

_____