[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 48.]

THE STATE OF OHIO, APPELLEE, *v.* CAMPBELL, APPELLANT.

[Cite as *State v. Campbell*, 2002-Ohio-1626.]

*Criminal law—Aggravated murder—Sentence of death upheld following remand, when.*

(No. 01-1057—Submitted January 30, 2002—Decided April 10, 2002.)

APPEAL from the Court of Common Pleas of Franklin County, No. 97CR-04-2020.

_____

MOYER, C.J.

{¶ 1} Appellant, Alva E. Campbell, Jr., appeals his sentence of death for the aggravated murder of Charles Dials.

{¶ 2} In 1972, Campbell was convicted of first-degree murder (former R.C. 2901.01) and sentenced to life imprisonment. Twenty years later, he was paroled. In 1997, he was arrested in Franklin County on a charge of aggravated robbery.

{¶ 3} On April 2, 1997, Deputy Sheriff Teresa Harrison drove Campbell from the Jackson Pike Jail to Franklin County for his arraignment. Campbell was feigning paralysis and was in a wheelchair.

{¶ 4} Around 12:30 p.m., Charles Dials was paying a ticket at the traffic bureau of the Franklin County Municipal Court. About the same time, Harrison parked in a courthouse loading dock and began to help Campbell out of the vehicle. Campbell suddenly assaulted her, stole her pistol, and fled.

{¶ 5} Dials had just driven away from the courthouse in his pickup truck when Campbell ran out into the street. Campbell stopped Dials's truck and pulled open the driver's door. Campbell told Dials, "I don't want to hurt you; just move over." Campbell got inside and drove off with Dials.

**{¶ 6}** Campbell drove to a K-Mart on South High Street. He parked there and talked with Dials, telling him not to be nervous. Then he drove to a factory on a side street. There, Campbell took Dials's money and made Dials exchange clothes with him.

**{¶ 7}** Campbell then drove back to High Street, bought a forty-ounce bottle of beer at a drive-through, and returned to the K-Mart. In the parked truck he sat talking with Dials "probably a good 2 hours," according to his confession. A radio report on Campbell's escape mentioned that he had commandeered a red truck. Dials said, "That's you, ain't it?" Campbell admitted it was, and they talked a while longer.

**{¶ 8}** Campbell then moved the truck behind the K-Mart, driving around the back lot three times before he finally chose a parking space. He told Dials to "get on the floor board of his truck." When Dials obeyed, Campbell shot him twice.

**{¶ 9}** Campbell drove around to the K-Mart's main parking lot and waited. Eventually, Katie Workman drove in and parked near the truck. Campbell then tried to kidnap her. Workman escaped, although Campbell seized her wallet and car keys. Campbell then drove Workman's car to a nearby shopping center, where he tried to kidnap James Gilliam. Gilliam also managed to escape, leaving his car but keeping his keys.

**{¶ 10}** Campbell drove around in Workman's car until a police officer saw him. He drove away from the officer, then abandoned the car and fled on foot. Campbell hid in a tree, but was spotted. When police surrounded the tree, Campbell dropped Deputy Harrison's gun and surrendered. In police custody, Campbell made a videotaped confession.

**{¶ 11}** Campbell was indicted on four counts of aggravated murder. Each aggravated murder count carried four death specifications: murder to escape detection, apprehension, trial, or punishment, R.C. 2929.04(A)(3); felony-murder predicated on aggravated robbery, R.C. 2929.04(A)(7); felony-murder predicated

on kidnapping, R.C. 2929.04(A)(7); and having a prior murder conviction, R.C. 2929.04(A)(5). The indictment also contained ten noncapital counts.

{¶ 12} Campbell was convicted of all counts and specifications; the trial court merged the death specifications under R.C. 2929.04(A)(3) into the felony-murder death specifications. Thus, only three specifications were presented to the jury at the penalty phase. The jury recommended a death sentence and, after merging the four aggravated murder counts into one, the trial judge sentenced Campbell to death on Count Three.

{¶ 13} Campbell appealed the judgment directly to this court pursuant to R.C. 2953.02 and Section 2(B)(2)(c), Article IV, Ohio Constitution. On December 20, 2000, we affirmed Campbell's convictions. However, we vacated the sentence because the trial court did not comply with the allocution provisions of Crim.R. 32(A)(1). See *State v. Campbell* (2000), 90 Ohio St.3d 320, 323-326, 738 N.E.2d 1178 ("*Campbell I*"). We remanded the cause to the common pleas court "with instructions to resentence Campbell on Count Three after directly asking him 'if he * * * wishes to make a statement in his * * * own behalf or present any information in mitigation of punishment.' " *Id*. at 326, 738 N.E.2d 1178.

{¶ 14} On remand, the trial court heard Campbell's allocution and considered an affidavit submitted by the defense. The court then sentenced Campbell to death. The cause is now before us upon an appeal as of right from the death sentence imposed on remand.

{¶ 15} In this appeal, the sole issue to be resolved is whether we should approve Campbell's sentence of death. Under R.C. 2929.05, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and whether the death sentence is proportionate to those affirmed in similar cases. Campbell contends that the aggravating circumstances present in

this case do not outweigh the mitigating factors beyond a reasonable doubt and that death is therefore not the appropriate penalty for the murder of Charles Dials.

## I. The Aggravating Circumstances

{¶ 16} Campbell was convicted of three aggravating circumstances: one under R.C. 2929.04(A)(5), having a prior conviction of an offense involving "the purposeful killing of or attempt to kill another," and two under R.C. 2929.04(A)(7), felony murder predicated upon aggravated robbery and kidnapping.

{¶ 17} The record clearly supports a conclusion that the (A)(5) specification is satisfied. State's Exhibit 1, introduced in the guilt phase, is a certified copy of a judgment of the Cuyahoga County Common Pleas Court. It confirms that Campbell was convicted of the first-degree murder of William Dovalosky on October 20, 1972.

{¶ 18} The evidence also supports both felony-murder specifications. Campbell's confession reveals that he killed Dials while committing kidnapping and aggravated robbery. Other evidence corroborates that confession. Courthouse security-camera photos show Campbell hijacking Dials's truck. Dials was shot with Deputy Harrison's gun, which Campbell had stolen, and Campbell's palm print was found in the truck. Katie Workman identified Campbell as the man she encountered in the K-Mart parking lot. Finally, Campbell was arrested while wearing Dials's clothing.

## II. Mitigating Factors

{¶ 19} A sentencer in a capital case must consider, as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973. See, also, *Eddings v. Oklahoma* (1982), 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1. Under R.C. 2929.04(B), mitigating factors include "the nature and circumstances

of the offense, the history, character, and background of the offender," and the factors set forth in R.C. 2929.04(B)(1) through (B)(7).

{¶ 20} At the penalty phase, Campbell presented three witnesses in mitigation: his sister Gwendolyn, Sergeant Don Thomas of the Franklin County Sheriff's Department, and Dr. Jeffrey Smalldon, a clinical psychologist.

{¶ 21} Upon remand to the trial court, Campbell elected to make a statement in allocution. Campbell expressed remorse for killing Dials. He spoke of his traumatic childhood, his religious conversion, and his health problems. He concluded by "throw[ing him]self on the mercy of the Court" and asking for forgiveness. Campbell also presented an affidavit by Sergeant Froilan Ochoa, a correctional officer who knew Campbell from having worked on death row, in which Ochoa commended Campbell on his sense of responsibility and good behavior.

A. Nature and Circumstances of the Offense

{¶ 22} The nature and circumstances of the offense have little mitigating value. Campbell emphasizes that he drank at least forty ounces of beer during the crime. Although voluntary intoxication is a mitigating factor, see *State v. Sowell* (1988), 39 Ohio St.3d 322, 325-326, 530 N.E.2d 1294, it is a weak one. See *State v. Otte* (1996), 74 Ohio St.3d 555, 568, 660 N.E.2d 711.

{¶ 23} Campbell stated in allocution that he had killed Dials by accident. However, the evidence does not support this contention. "The murder of Charles Dials culminated a kidnapping that lasted over two hours." *Campbell I*, 90 Ohio St.3d at 330-331, 738 N.E.2d at 1193. Cf. *State v. Keenan* (1998), 81 Ohio St.3d 133, 140, 689 N.E.2d 929; *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909. After carefully choosing the site of the murder, Campbell made Dials lie on the floor of the truck, then shot him at close range in the face and neck. As we said in *Campbell I*, 90 Ohio St.3d at 330, 738 N.E.2d 1178, this was "a calculated, execution-style murder."

B. History, Character, and Background

**{¶ 24}** As in many death penalty cases we have reviewed, Campbell's principal mitigation lies in the conditions to which he was subjected by his parents while he was a minor.

**{¶ 25}** Campbell was born on April 30, 1948, one of six children raised in an abusive, loveless, amoral, and unstable environment. His parents got drunk every weekend. When drunk, they fought physically and verbally. Campbell's sister Gwendolyn testified that their father beat their mother viciously, "like he was in the [boxing] ring," while the children were forced to watch. He would also expel Campbell's mother from the house in cold weather and threaten to kill the children if they let her back in.

**{¶ 26}** Despite his father's threats, Campbell once tried to defend his mother from his father's abuse. According to Smalldon, Campbell experienced "tremendous feelings of powerlessness [and] helplessness" because he was unable to protect his mother from his father.

**{¶ 27}** Campbell's father also abused Campbell and the other children. He beat them severely, forbade them to have friends, and played cruel, bizarre games to frighten them. Campbell was especially close to his younger brother, Dennis, whom he took care of and tried to protect. The death of Dennis at age three was a traumatic experience for Campbell.

**{¶ 28}** The Campbell children received no affection, emotional support, or moral guidance from their parents. Campbell was encouraged to steal as early as age six or seven. Campbell stole to emulate his father, who bragged about stealing and praised Campbell for stealing without getting caught.

**{¶ 29}** Campbell's father sexually abused two of his four daughters. The rest of the family knew about the abuse. Campbell's father was eventually prosecuted and, in 1958, confined at the Lima State Hospital. In his allocution, Campbell asserted that, when he was eight years old, his father had sexually

molested him also. However, Campbell had previously denied this when asked by Smalldon.

{¶ 30} When Campbell's father was removed from the household, Campbell was still unsupervised because his mother abused alcohol heavily. Campbell seldom attended school. When Campbell was eleven, he and the other children were taken from their mother.

{¶ 31} Over the ensuing six years, Campbell went through further instability, moving from placement to placement. Between 1959 and 1965, Campbell was placed in "two different residential treatment facilities in Pennsylvania, * * * nine separate detention center placements [and] * * * two different foster homes." Encouraged by his mother, he ran away every chance he got.

{¶ 32} In his allocution, Campbell stated that a counselor at one of the Pennsylvania institutions tried to molest him. He also stated that he was sent from that institution to foster parents who were alcoholics.

{¶ 33} Campbell had what Smalldon described as an "incredibly erratic history of formal educational experiences" and "multiple contacts with the juvenile justice system," beginning around the age of twelve, including theft, assault, and truancy charges. In 1961, a doctor at the Juvenile Diagnostic Center in Columbus wrote that Campbell "shows a violent rage under the surface" and "sees the environment as aggressive and hostile." At nineteen, he went to prison for the first time, convicted of shooting a state trooper with intent to kill; he was released in 1971.

{¶ 34} Smalldon examined Campbell seven times prior to testifying, conducting a "wide-ranging interview" and a battery of psychological and neuropsychological tests. Smalldon also interviewed three of Campbell's sisters and his ex-wife, and reviewed an assortment of Campbell's records.

{¶ 35} Smalldon considered the relationship of Campbell's childhood to his adult behavior. According to Smalldon, the eleven years between Campbell's birth and his father's removal from the home were crucial: "[T]hat's when the learning that provides the foundation for adult personality takes place."

{¶ 36} Smalldon testified that children raised in a family where sexual abuse occurs often feel "[d]istrust and hostility toward outsiders." They also grow up with a "constricted" emotional range; this is consistent with Campbell's personality, in that Smalldon deemed him "profoundly deficient in his ability to experience empathy." Frequently, such children adopt an attitude of "narcissism or arrogance" to compensate for low self-esteem.

{¶ 37} Campbell's childhood has some mitigating value. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 41, 544 N.E.2d 895; *State v. Murphy* (1992), 65 Ohio St.3d 554, 586, 605 N.E.2d 884. Nevertheless, Campbell was nearly forty-nine years old when he committed the murder that is the subject of this case. He had reached "an age when * * * maturity could have intervened" and "had clearly made life choices as an adult before committing [this] murder." *Id.* at 588, 605 N.E.2d 884 (Moyer, C.J., dissenting). At forty-nine, Campbell had considerable time to distance himself from his childhood and allow other factors to assert themselves in his personality and his behavior.

{¶ 38} Moreover, as the trial court noted, Campbell's sisters endured the same abusive environment as Campbell endured, yet grew up to be law-abiding citizens. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 452, 588 N.E.2d 819; *State v. (Jerome) Campbell* (1994), 69 Ohio St.3d 38, 55, 630 N.E.2d 339.

{¶ 39} Finally, we reject Campbell's argument that he should be spared because he "has already suffered enough." This argument is an appeal to sympathy, whereas "the sentence * * * should reflect a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion." *California v. Brown* (1987), 479 U.S. 538, 545, 107 S.Ct. 837, 93

L.Ed.2d 934 (O'Connor, J., concurring). His childhood suffering is relevant, but only to the extent his "criminal * * * acts are attributable to" it. *Id.*

{¶ 40} For these reasons, although we acknowledge that Campbell was raised in an abusive and hostile environment, we accord minimal weight to it in mitigation.

C. Statutory Mitigating Factors, R.C. 2929.04(B)(1) through (B)(6)

{¶ 41} Campbell does not claim that any of the specific mitigating factors set forth in R.C. 2929.04(B)(1) through (B)(6) exist in this case. Nor did any evidence at trial suggest that any of these factors exist.

D. "Other Factors," R.C. 2929.04(B)(7)

{¶ 42} Under R.C. 2929.04(B)(7), we must consider "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."

1. Adjustment to Prison/Lack of Future Dangerousness

{¶ 43} A major defense theme in the penalty phase was that Campbell would conduct himself well in prison and would not be a danger to society if allowed to live. Accordingly, the defense introduced evidence of Campbell's good behavior in prison during his previous sentence and on death row since his conviction in this case.

{¶ 44} Smalldon studied the records of Campbell's twenty-year imprisonment for his earlier murder, and described his adjustment as "a mixed bag," but "generally very positive." The records depict a reliable worker who does more than required. In 1989 or 1990, Campbell was commended for coming to the aid of a female guard who was attacked by two inmates she was transporting, placing himself in "considerable physical danger."

{¶ 45} As further evidence of good adjustment to prison, the defense pointed to various prison-sponsored activities in which Campbell had participated. Campbell coached a softball team, took part in the Jaycees' "Checkmate Program"

(described as "a program to assist young people"), and was involved in alcohol and drug counseling programs.

{¶ 46} Smalldon attributed Campbell's "generally very positive" adjustment to prison principally to his "almost frantic rebellion * * * against the image of himself as incompetent or not worth anything." Smalldon did concede that the hope of parole might have contributed to Campbell's good behavior: "I don't think there's any question that Mr. Campbell is capable of manipulation."

{¶ 47} In fact, Smalldon noted in the prison records an incident that showed Campbell to be "capable of manipulative behavior." Campbell "cultivated some kind of a relationship with a prison employee," leading to "communication between Mr. Campbell and this [employee] about his obtaining a key that * * * would have enabled him to meet with this woman in a private room."

{¶ 48} Nevertheless, Smalldon thought it unlikely that manipulation can completely explain Campbell's good behavior over twenty years, because Campbell had an "antisocial personality disorder," and persons with such a disorder "tend to be short-term planners."

{¶ 49} Smalldon's assumption that Campbell is a "short-term planner" seems inconsistent with Campbell's admission to police that he "had planned * * * all along" his escape from custody. Still, Smalldon saw no inconsistency. He interpreted Campbell's admission to mean only that Campbell watched for an opportunity to escape *after* he saw that the jail staff believed his claim of paralysis. Smalldon thought the escape was improvised, and he did not believe that Campbell had "any well thought out plan."

{¶ 50} Smalldon also reviewed Campbell's Franklin County Jail records, which show persistent efforts to prepare a second escape, as well as multiple instances of "manipulative behavior," during his pretrial incarceration. On two occasions, Campbell tried to persuade people to smuggle saw blades to him; on one of those occasions, he wrote out explicit instructions for concealing such a blade in

a piece of mail. Metal towel hooks were twice found concealed in his cell. Campbell once threatened to stab a sergeant the next time the sergeant came to his cell; he said he "had nothing to lose" since he was "lookin[g] at the chair anyway." Smalldon concluded that Campbell's overall adjustment to the jail was poor.

{¶ 51} Nonetheless, Campbell argues that "he will behave appropriately in a state penal institution." As evidence, he cites the affidavit of Sergeant Froilan Ochoa, a correctional officer at the Mansfield Correctional Institution formerly assigned to death row.

{¶ 52} The affidavit stated that during Ochoa's tour of duty, Campbell served as death row food porter, which "required him to separate trays and to serve hot food in equal amounts to the inmates." Ochoa felt that Campbell "did a great job." Campbell "got along with every corrections officer, which is unusual," and treated everyone with respect.

{¶ 53} Ochoa urged Campbell to read the Bible, and Campbell did so with apparent enthusiasm. In Ochoa's opinion, Campbell was "mature, intelligent, and responsible," "clean and orderly," and "serious." In fact, Ochoa considered Campbell "one of the best inmates that [Ochoa] ha[d] dealt with" in seventeen years as a correctional officer, and he wished Campbell could be his porter again.

{¶ 54} Ochoa's affidavit also states that Campbell received no "disciplin[ary] write-ups" while Ochoa worked on death row. The state rebutted with a hearing officer's finding that Campbell had possessed contraband in his cell. However, the record does not disclose whether Ochoa was working on death row at that time.

{¶ 55} The state also contends that Ochoa's evaluation of Campbell is unreliable. At the resentencing hearing, the prosecution introduced documents showing Ochoa's disciplinary record. Between 1988 and 1998, Ochoa was reprimanded twice and received two suspensions totaling eight days. In August 1997, he was evaluated as performing below expectations in six of eight areas. One

month later, he was demoted from sergeant to correctional officer. (He was promoted back to sergeant when transferred from death row to another unit.)

{¶ 56} The state argues that Ochoa's record indicates that his "judgment is questionable." This argument is of dubious merit, since prison authorities evidently trusted Ochoa's judgment enough to assign him to death row.

{¶ 57} More persuasively, however, the state argues that Campbell has a record of fooling and manipulating those who have dealt with him in the past. That was how he escaped from custody in the first place, leading to Dials's murder. Dr. Smalldon conceded that Campbell's jail records show "multiple indications * * * of what's described as manipulative behavior on his part." Furthermore, Smalldon observed that Campbell "expends a tremendous amount of energy in impression management." Even in state prison, he tried to manipulate a prison employee into slipping him a key to a private room.

{¶ 58} Campbell's previous good adjustment to prison is not an impressive mitigating factor. While it deserves some weight, it must be viewed in light of Campbell's manipulative nature and his poor adjustment to incarceration in the Franklin County Jail. Campbell's feigning of paralysis, his possession of towel hooks, his attempts to obtain saw blades, his threats to a guard in the county jail, and his assault on Harrison tend to refute his claim that he is likely to behave well in prison.

{¶ 59} A related point raised by Campbell in allocution was his ill health and the likelihood that he will die in prison. See, generally, *Campbell I*, 90 Ohio St.3d at 327, 738 N.E.2d 1178, quoting *State v. Bradley* (1989), 42 Ohio St.3d 136, 149, 538 N.E.2d 373 (probability that defendant will never be released from prison if sentenced to life should be considered mitigating under R.C. 2929.04[B][7]). Campbell stated that he suffered from asthma and emphysema, had recently had half a lung surgically removed, was facing "major surgery" on his throat, and did not know how much longer he had to live.

**{¶ 60}** Finally, at trial Sergeant Don Thomas of the Franklin County Sheriff's Department testified concerning the procedures used to transport Campbell to and from the jail after his escape and recapture. Campbell was patted down, placed in handcuffs, leg irons, and a belly chain, and escorted by several deputies, including a supervisor. This testimony suggests that Campbell can be rendered harmless with appropriate precautions. However, these precautions were extraordinary, and Thomas did not know whether similar precautions would be used in the state prison system.

2. Remorse

**{¶ 61}** Campbell expressed remorse for killing Dials, both in his confession to police and in his allocution to the trial court. He also indicated remorse in an interview with Smalldon. Smalldon believed that his remorse was "genuine" but not "as deep as we * * * more normally functioning people without his kind of severe emotional and personality disturbance think of when we talk about the word remorse."

**{¶ 62}** However, we question Campbell's sincerity. He falsely claimed in allocution that he "did not mean to take the life of Mr. Dials. * * * It was an accident." He also lied to Smalldon, claiming that the murder was an act of "self-defense." Moreover, Campbell did not surrender to police until surrounded by them. Cf. *State v. Wiles* (1991), 59 Ohio St.3d 71, 93-94, 571 N.E.2d 97 (defendant fled state, but later surrendered spontaneously and voluntarily to police); *State v. Hicks* (1989), 43 Ohio St.3d 72, 80, 538 N.E.2d 1030.

**{¶ 63}** Finally, Smalldon diagnosed Campbell as having an antisocial personality disorder, and one characteristic of that disorder is *lack* of remorse. In fact, Smalldon thought Campbell incapable of "the kind of deep feelings for someone else" implied by the word "remorse."

**{¶ 64}** Retrospective remorse, even when sincere, generally deserves "little weight." See *State v. Post* (1987), 32 Ohio St.3d 380, 394, 513 N.E.2d 754. On

the record before us, we find that Campbell's remorse is not sincere, and hence is entitled to no weight at all.

### 3. Personality Disorder

{¶ 65} Smalldon testified that Campbell has an antisocial personality disorder, which is characterized by a pattern of disregard of others' rights, lawbreaking, lying, impulsivity, fighting, irresponsibility, and lack of remorse. However, Smalldon also testified that many people who have an antisocial personality disorder nonetheless can function in society and do not commit crimes. Therefore, we find that Campbell's antisocial personality disorder deserves little weight. See *State v. Cooey*, 46 Ohio St.3d at 41, 544 N.E.2d 895.

### 4. Severity of Life Sentence

{¶ 66} Conceding that he "can never be released from prison" and "should not be allowed to live in society," Campbell asks for a sentence of life without possibility of parole. Campbell argues that, because life imprisonment without possibility of parole is a "stern" and "very serious" punishment, it is an adequate one, and the state need not execute him in order to achieve retribution.

{¶ 67} We do not doubt that life imprisonment without possibility of parole is a stern punishment. Yet we must also observe that Campbell was already under a life sentence when he escaped from Deputy Harrison and killed Charles Dials. Since no one can serve more than one life sentence, we have no authority to lengthen the term of imprisonment Campbell faced before the murder of Dials. If we reduce Campbell's sentence in the instant case to life imprisonment without possibility of parole, the only additional penalty he will incur for murdering Dials will be that he will no longer be eligible for parole. Thus, the severity of life imprisonment as a penalty is an unpersuasive reason against imposing a death sentence in this case and is entitled to little weight in mitigation.

### III. Weighing

**{¶ 68}** We may affirm Campbell's death sentence "only if * * * persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case." R.C. 2929.05(A). Moreover, we must be so persuaded beyond a reasonable doubt. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 206, 15 OBR 311, 473 N.E.2d 264, 302.

**{¶ 69}** Against Campbell's mitigation, we must weigh three aggravating circumstances. In particular, the (A)(5) prior-murder circumstance "can be even more grave than other aggravating circumstances." *State v. Taylor* (1997), 78 Ohio St.3d 15, 34, 676 N.E.2d 82, 99, citing *State v. Carter* (1992), 64 Ohio St.3d 218, 228, 594 N.E.2d 595, 602. In addition, there are two felony-murder aggravating circumstances. For the reasons discussed in Part II, *supra*, we find that these aggravating circumstances outweigh, beyond a reasonable doubt, the mitigating factors present in this case.

IV. Proportionality

**{¶ 70}** Finally, we conclude that the death sentence is proportionate to sentences approved in similar cases. See *State v. Spirko* (1991), 59 Ohio St.3d 1, 570 N.E.2d 229; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; *State v. D'Ambrosio*, 73 Ohio St.3d 141, 652 N.E.2d 710; *State v. Otte*, 74 Ohio St.3d 555, 660 N.E.2d 711; *State v. Keenan*, 81 Ohio St.3d 133, 689 N.E.2d 929.

**{¶ 71}** We affirm the sentence of death imposed upon Alva E. Campbell, Jr., for the aggravated murder of Charles Dials.

*Judgment affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

*Ron O'Brien*, Franklin County Prosecuting Attorney, and *Steven L. Taylor*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Joseph E. Wilhelm*, Appellate Supervisor, Death Penalty Division, and *Kelly L. Culshaw*, Assistant Public Defender, for appellant.

_____