OPINION.
The petitioner, Raymond Tibbetts, appeals from the trial court's order dismissing his petition for postconviction relief brought pursuant to R.C. 2953.21. Tibbetts was convicted of the murders of his wife and an elderly gentleman with whom the couple lived. He was sentenced to death for each of the murders and his case is presently on direct appeal to the Ohio Supreme Court. The trial court held that an evidentiary hearing was not necessary to determine the issues that Tibbetts raised in his petition and, concurrent with its entry dismissing the petition, filed its findings of fact and conclusions of law.
Tibbetts presents three assignments of error in which he contends that: (1) the trial court erred by dismissing his petition without granting his request for discovery, (2) the trial court erred by denying him an evidentiary hearing on each of his fifteen claims for relief, and (3) the trial court erred by applying the doctrine of res judicata. Finding no merit in these assignments, we affirm.
 FACTS
The facts of the two murders are simple and brutal. The body of Judith Sue Crawford, Tibbetts's wife of several weeks, was found in the building on Mohawk Street in downtown Cincinnati. The couple lived with the owner of the building, Fred Hicks, a 67-year-old gentleman on oxygen. Crawford's skull had been crushed with a baseball bat. The coroner determined that she had sustained at least four major blows from the bat and that she was dead as a result of the blows. Crawford's killer, nonetheless, then stabbed her body twenty-one times — eighteen of those in the back. Knives from the downstairs kitchen were found scattered around the room, some of them bizarrely bent. One knife still protruded from Crawford's neck. The body was covered with a sheet. Crawford's wedding band was found off her hand and underneath the body.
Downstairs, the body of Fred Hicks, the owner of the building, was also found lifeless. The body had been stabbed twelve times, most of the wounds near the chest. Four knives were still stuck in the body. The right front pocket of Hicks's clothing, where he kept his cash, was empty and inside out. The ashtray where he kept the keys to his car, a Geo Metro, was overturned. The keys were gone. So was the car.
Tibbetts immediately became a suspect. From interviewing witnesses and reviewing videotape from a surveillance camera positioned across the street from the building, police were able to reconstruct that Tibbetts, Crawford, and Hicks had returned home at around six o'clock the evening of the murders. Crawford's sister telephoned and spoke with Crawford at eight o'clock. During the course of the conversation, Crawford indicated that she was fearful because Tibbetts was using crack cocaine. The sister became worried around ten o'clock and called back. Tibbetts answered the telephone. Against a background of silence that Crawford's sister thought unusual for the household, Tibbetts told her that Crawford was sleeping. At eleven-thirty a former girlfriend of Tibbetts received a telephone call from him in which he cryptically told her that he was sorry for what he had done and that he hoped she would forgive him. The woman described Tibbetts as cold and emotionless.
At approximately twelve-thirty that morning, a member of the Covington police department observed Tibbetts stranded on the road in a disabled vehicle. The car was the Geo Metro owned by Hicks. According to the Covington police officer, Tibbetts told him, falsely, that the car belonged to a friend of his in Covington. The car was subsequently towed to a police impounding lot; Tibbetts, however, was not detained since the Cincinnati police had yet to put out a bulletin for his arrest, and the Covington officers testified that they did not have reason to suspect that he had been driving under the influence.
Two days later, Tibbetts attempted to admit himself to the alcoholic treatment center at St. Elizabeth Hospital. Although providing hospital personnel with his Social Security number and birth date, Tibbetts gave a false name. He was treated for lacerations to his hands that were later linked to the murders. Blood on his clothes later proved to be that of Crawford and Hicks.
Eventually Tibbetts's presence at the hospital came to the attention of the Cincinnati police, and, upon request, he was arrested by Edgewood police officers for receipt of stolen property — Hicks's Geo Metro — and transported to the Kenton County Jail. At the jail, two Cincinnati police homicide detectives attempted to interrogate Tibbetts. After being informed of his rights, Tibbetts signed a written waiver and responded to a question concerning the cuts still visible on his hands. Tibbetts replied that he had cut himself while staying at a barge along the river. Tibbetts was then asked if he had "seen his wife lately." He replied that it had been "a while." Tibbetts then asked to speak to an attorney, stating that he did not wish to continue with the interview. When one of the officers informed him that, if that were the case, the interview would conclude and they would be leaving, Tibbetts allegedly replied, "What's the charge, manslaughter?" He was advised by one of the detectives that the investigation was still "ongoing." No further questions were asked and the interview concluded.
At trial, Tibbetts testified in his own defense. He stated that on the morning of the murders he woke up in the apartment building on Mohawk Street and took the antidepressant Effexor, finished off a bottle of vodka, ingested two or three Darvocets and three Valiums, and then smoked crack cocaine. He testified that he could remember then sitting down for breakfast, although he could not remember what he ate. Then, according to Tibbetts, he experienced a blackout that eradicated most of his memory of that day. The only other thing he could remember was being upstairs with Crawford at night, sitting on the couch and arguing with her over his use of crack cocaine. He recounted that he accused her of hypocrisy since Crawford was an alcoholic. Asked what else he remembered, Tibbetts replied, "All I remember is, uhm, we was arguing, she was screaming about doing this, about hollering about this. And she kept a knife up there and, you know, alls I remember is her just screaming." Asked what he remembered next, Tibbetts replied, "I don't remember anything."
Tibbetts testified that his earliest recollection subsequent to arguing with Crawford was speaking to the Covington police officer after the Geo Metro had broken down. He testified that at that point he still had no memory of the murders and was not concerned with being apprehended as a murder suspect. He could not explain, however, why, if this were true, he chose to lie to the police officers about the ownership of the vehicle. He then described how he had wandered the next few days, finally breaking into a boat at a Kentucky marina and falling asleep in the bed, only to be discovered later by the boat's owner. Tibbetts testified that soon afterward he attempted to check himself into the treatment center at St. Elizabeth.
 FIRST ASSIGNMENT OF ERROR
In his first assignment of error, Tibbetts argues that that the trial court erred in dismissing his postconviction petition without granting his request for discovery. This assignment is overruled upon the basis of our previous holding that Ohio's postconviction statutes do not contemplate discovery in the initial stages of the proceedings. See,e.g., State v. Campbell (Jan. 8, 1997), Hamilton App. No. C-950746, unreported; State v. Zuern (Dec. 4, 1991), Hamilton App. Nos. C-990481 and C-910229, unreported; State v. Buerger (Dec. 20, 1989), Hamilton App. No. C-880664, unreported.
 SECOND ASSIGNMENT OF ERROR
In his second assignment of error, Tibbetts argues that the trial court erred by denying him an evidentiary hearing on each of his fifteen claims for relief. In order to determine the merits of this assignment, we must examine each of the fifteen claims separately.
1. First Claim for Relief
In his first claim for relief, Tibbetts alleged that Ohio's postconviction process violated his constitutional rights to procedural due process under both the Ohio and the United States Constitutions. This argument has been rejected by this court before. State v. Jones (Dec. 28, 2000), Hamilton App. No. C-990813, unreported; State v. Fautenberry
(Dec. 31, 1998), Hamilton App. No. C-971017, unreported; State v.Sanders (Mar. 26, 1999), Hamilton App. No. C-980154, unreported. Given the purely legal nature of the argument, no evidentiary hearing was required.
2. Failure to Investigate the Crime Scene
In his second claim for relief, Tibbetts argued that he was denied effective assistance of counsel. He argued that his trial attorneys failed to "make an informed and sound decision to present exculpatory evidence by an expert qualified to evaluate the crime scene." In support of this claim, Tibbetts presented the affidavit of a criminalist, Barton P. Epstein, in which Epstein stated that he had reviewed various materials and determined that additional effort "may" have led to more relevant evidence being developed. But Epstein also stated that his evaluation had developed "no new relevant evidence which excludes or includes Mr. Tibbetts as the perpetrator." Tibbetts also presented the affidavit of Joseph R. Determan, the Chief Investigator for the Hamilton County Public Defender's Office. Determan stated that "for several reasons" he had been unable to conduct a thorough investigation in this case. According to Determan, defense counsel had informed him that the prosecutor's office would not permit him to view evidence. Unfortunately, there are pages missing from the affidavit as it appears in the record certified to us. (Exhibit Y.)
This material presented nothing that would have warranted an evidentiary hearing. As we have often stated, claims for postconviction relief must meet a threshold level of cogency and consist of more than "mere hypothesis and a desire for further discovery." State v. Coleman
(Mar. 17, 1993), Hamilton App. No. C-900811, unreported. Tibbetts's second claim was entirely hypothetical, as evidenced by his resort to the subjunctive case. His claim stated that vital evidence "may" have been lost forever; elsewhere he referred to evidence "which might have been present at the crime scene." Such a claim was simply too speculative to warrant an evidentiary hearing.
3. Failure to Present Adequate Evidence of Voluntary Intoxicationand Drug Interaction
In his third claim, Tibbetts argued that his trial attorneys "fell far below a minimum standard of reasonable legal representation in their failed attempt to present a defense of voluntary intoxication." Specifically, Tibbetts argued that his trial counsel was remiss in failing to obtain an expert opinion to corroborate his claim of drug-induced blackout. An expert in pharmacology, Tibbetts contended, would have been able to substantiate his testimony that he had no awareness of his actions because of the synergistic effects of crack cocaine, Vodka, pain pills and the antidepressant Effexor. Such expert testimony, Tibbetts argued, would have bolstered his argument that he lacked the mental capacity for "prior calculation and design" necessary to establish aggravated murder.
Similarly, in his fourth claim, Tibbetts argued that his defense attorneys were ineffective during the mitigation phase for their same failure to obtain a pharmacological expert to explain to the jury the effects of the pills, alcohol, and crack cocaine on his ability to grasp and control his behavior.
a. Voluntary Intoxication During the Guilt Phase
Voluntary intoxication is not itself a defense. See State v. Otte
(1996), 74 Ohio St.3d 555, 564, 660 N.E.2d 711, 720, and Nichols v.State (1858), 8 Ohio St. 435, 439. Evidence of voluntary intoxication may be presented, however, to negate an element of specific intent such as the requirement of "prior calculation and design" in the aggravated-murder statute, R.C. 2903.01(A). Otte, supra, at 564,660 N.E.2d at 720; State v. Fox (1981), 68 Ohio St.2d 53, 55, 428 N.E.2d 410,411-412; Nichols, supra, at 439. It is generally understood that although the defendant's intoxication must be severe enough to deprive him of the ability to calculate and design, it need not render him unconscious or temporarily insane. See LeFave Scott, Criminal Law (1972), 345, Section 45. The capacity for forethought, however, must be completely eradicated. "Only where the defendant was `so intoxicated as to be mentally unable to intend anything' will his intoxication create a reasonable doubt as to his ability to form the specific intent essential to the charged felony." Otte, supra, at 564, 660 N.E.2d at 720, quotingState v. Jackson (1972), 32 Ohio St.2d 203, 206, 291 N.E.2d 432, 433.
Effective January 1, 1974, the General Assembly reclassified first-degree murder as "aggravated murder" and replaced the former requirement of "deliberate and premeditated malice" with "prior calculation and design." The purpose of this substitution was to discard judicial interpretation of the former law that countenanced a finding of premeditated murder based upon a spur-of-the-moment decision. See 1973 Technical Committee Comment to Am.Sub.H.B. No. 511. But, notwithstanding the substitution, the Ohio Supreme Court has made clear that evidence of a "planned, cold-blooded killing" is not required to uphold findings of prior calculation and design. Rather, the court has found the requirement satisfied in "short-lived emotional settings" and has expressly rejected any "bright-line test that emphatically distinguishes between the presence or absence of `prior calculation and design.'" State v. Taylor
(1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82, 88.
In support of his claim that his trial attorneys failed to effectively present a "defense" of voluntary intoxication, Tibbetts presented evidentiary materials including newspaper articles and medical literature concerning the potential harmful side effects of Prozac and other serotonin-uptake inhibitors like Effexor. Such literature has contributed to the creation of the so-called "Prozac defense." The defense is based primarily upon anecdotal data suggesting that for a small number of individuals Prozac may increase impulsive violent tendencies while lessening the individual's ability to control them, particularly when combined with the effects of alcohol.
Tibbetts also presented the affidavit of a mitigation specialist for the Public Defender's Office, Dorian Hall, who stated that a pharmacological expert could have addressed the "biochemical interactions" of the substances and medications Tibbetts claimed to have smoked and ingested. Such expert explanation, according to the mitigation specialist, would have "been effective in explaining to the jury [Tibbetts's] ability to function and his state of mind at the time of the offense."
Dr. Janice Ort, a clinical psychologist who examined Tibbetts subsequent to his conviction, stated that "[w]hat Ray Tibbetts experienced and felt the evening of the instant offense is speculative." (Emphasis supplied.) She also stated, though, that "anything [Tibbetts] felt was exacerbated by the substances he had abused over the course of the day. It is very likely they drove his aggressive actions and diminished any capacity for control to inhibit his behavior he might have had." As for Tibbetts's alleged memory loss, she stated.
 Mr. Tibbetts maintains no memory of the evening of the instant offense. Several possible explanations exist regarding this lack of memory. The most obvious is that he may not be telling the truth. The second is that he may have been in an alcohol-induced blackout, which resulted in total loss of memory. A toxicologist would need to examine the medical evidence to determine the likelihood of this possibility.
 A third possibility is that Ray Tibbetts is repressing the knowledge of what happened that evening and does not, as a result, have access to the memories. * * * This is not a conscious, willful process and cannot be "undone" by simply insisting one can and must recall what occurred.
 Finally, what seems most likely as an explanation to Mr. Tibbetts' [sic] lack of memory for the night of the instant offense is a combination of repression and an alcohol[-]induced blackout.
(Emphasis supplied.)
 Dr. Ort recommended that Tibbetts's records be reviewed by a pharmacological expert to "explore the physiological impact of the drugs and alcohol Mr. Tibbetts consumed on the day of the instant offense on his behavior." Tibbetts did not submit, however, to any review by a pharmacological expert bearing specifically on his case.
In order to demonstrate ineffective assistance of counsel, Tibbetts had to show (1) that his trial attorneys' performance was so deficient that it violated a substantial duty, and (2) prejudice. State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373, certiorari denied (1990),497 U.S. 1011, 110 S.Ct. 3258; Lockhart v. Fretwell (1993), 506 U.S. 364,113 S.Ct. 838; State v. Powell (1993), 90 Ohio App.3d 260, 629 N.E.2d 13. In order to establish prejudice, Tibbetts had to show that his trial attorneys' errors were "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." Fretwell, supra, at 369,113 S.Ct. 842-843, citing Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 2064. "Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." United States v. Cronic (1984), 466 U.S. 648,658, 104 S.Ct. 2039, 2046.
Having reviewed the materials submitted by Tibbetts, we are not convinced that they established that Tibbetts's trial attorneys were ineffective, or the necessity of an evidentiary hearing. As we have noted, Tibbetts did not have a pharmacological expert review the postconviction evidence in this case and offer findings, such as he did with the crime-scene expert. Thus it is only speculative as to what such an expert may have found and how helpful his findings may have actually been.
Further, the usefulness of a pharmacological expert is refuted by what we perceive as the overwhelming evidence in this case that the person who committed the murders was capable of intentional conduct. The victims were stabbed not once, haphazardly, but multiple times with obvious purpose. One victim was killed after the other on a different floor of the building. Crawford's body was covered with a blanket. The wounds on Hicks were all in proximity to his chest, indicating a clear purpose to kill. Hicks was, furthermore, robbed and his car keys stolen. Tibbetts told Crawford's sister that she was "sleeping" and then called the mother of one of his children after the killings, expressing remorse. He then took flight, later lying to the Covington Police about ownership of the Geo Metro. He avoided returning to the murder scene, his residence, over the next several days — a fact entirely inconsistent with his testimony that he could not remember having murdered anyone. (If he could not remember, why did he not simply go home?) Such a deliberate course of action soundly refutes the notion that, in whatever state of mind he was in, Tibbetts was unable to calculate or design — that he was "mentally incapable of intending anything." Even if we assume that Tibbetts was not lying about his inability to recall events, the evidence was overwhelming that during the period of the murders he maintained a sufficient level of reasoning to engage in intentional conduct, to act with deliberation, to deceive others, to converse intelligently, and to experience and express remorse.
b. Failure to Present Expert Testimony of Drug Interaction DuringMitigation
Unlike what occurred in the guilt phase, the defense did present a psychiatrist, Dr. Glen Weaver, to testify during the mitigation phase. Dr. Weaver was a board-certified diplomat in both psychiatry and the subspecialty of forensic psychiatry. In addition to interviewing Tibbetts personally on three separate occasions, Dr. Weaver had Tibbetts's EEG examined for signs of brain injury and also had another doctor, Dr. Tureen, perform neuropsychological testing for the same purpose. (No signs of organic brain damage were found.)
Dr. Weaver gave a detailed history of Tibbetts's history of drug abuse. He stated that the test results showed that Tibbetts had limited personality control and was subject to explosive rage, and that "with the use of alcohol or with drugs, he would have no ability to control the impulses he might feel." Significantly, Dr. Weaver testified that Tibbetts might "even have [had] disassociative episodes [in] which he might do things which he would have no recall for later." He compared this to "the reports that one has seen of multiple personality," the only difference being that Tibbetts's disassociative episodes were drug-and alcohol-induced. He stated that during such a periods of disassociation people responded "in a fashion which * * * might be totally out of character." Elsewhere he testified that Tibbetts's capacity to control his impulses on the night of the murder "was substantially reduced." "His ability to conform his conduct, certainly to requirements of the law, they weren't there. He didn't have it."
In determining whether trial counsel's performance was deficient, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland v. Washington, supra, at 690, 104 S.Ct. at 2065. As this court observed in Zuern, supra, "It is well established that the constitution does not guarantee a perfect trial or even the best available defense." And as the Ohio Supreme Court has stated,
 We deem it misleading to decide an issue of competency by using, as a measuring rod, only criteria defined as the best available practice in the defense field. There are many attorneys who fail to use the best available practices, yet relatively few who are found to be incompetent.
 State v. Lytle (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623, 627; see, also, State v. Post (1987), 32 Ohio St.3d 380, 513 N.E.2d 754.
We hold that the expert testimony of Dr. Weaver presented by defense counsel during mitigation was strong and effective support for the proposition that Tibbetts experienced a drug-and-alcohol-induced disassociative episode during the murders a state in which he lacked the normal behavioral controls, could not control his impulses, and acted totally out of character. Further, we reject the argument that, by failing to present a pharmacological expert, defense counsel's performance fell outside the "the wide range of reasonable professional assistance."
We hold, therefore, that the trial court did not err by dismissing without an evidentiary hearing Tibbetts's third and fourth claims for relief.
4. Defense Counsel was Ineffective by Failing to Fully Present AllAvailable Mitigation Evidence
In his fifth claim for relief, Tibbetts argued that his trial attorneys were ineffective during the mitigation phase by (1) failing to present further witnesses who could have testified to the horrors and cruelty of his childhood, and (2) failing to present the results of a "comprehensive psychological evaluation, based upon a complete and accurate history [by] which to assess and diagnose [Tibbetts's] mental disorders and the source of his polysubstance abuse." In support of this claim, Tibbetts presented the affidavits of friends and family members concerning the details of his upbringing. Further, he presented the reports and affidavits of Dr. Ort and Hall, both of whom criticized Tibbetts's trial attorneys for their perceived failure to present further lay witnesses "to add detail to the horrific elements of Tibbetts's childhood," as well as their failure to present experts "to explain the physical effects of the drug and alcohol interactions and * * * to discuss [Tibbetts's] chemical dependency * * *."
We have already rejected the argument that the failure of Tibbetts's trial attorneys to present an expert to discuss the "pharmacology" of the drugs he ingested rendered their performance ineffective. We agree that more witnesses may have added significant anecdotal details concerning Tibbetts's childhood. As we noted in State v. Steffen (Aug. 7, 1991), Hamilton App. No. C-900596, unreported, however, provided that the jury is substantially informed of the defendant's background, a claim of ineffective assistance of counsel is not established simply because it may be reasonably asserted that the evidence "may have been developed at greater length, or presented with more adroitness * * *. "
Here, Dr. Weaver referred several times in his report and during his testimony to Tibbetts's childhood, telling the jury that it was "miserable" and "horrible" and that Tibbetts and his siblings were treated "more like animals" by a series of foster parents. He described both Tibbetts's natural parents as drug users and his father as an alcoholic. (Tibbetts and his siblings were removed from their home when Tibbetts was four.) Dr. Weaver, furthermore, related Tibbetts's behavior the night of the murders to his childhood, agreeing with defense counsel that Tibbetts was "damaged goods" as early as five years old. Dr. Weaver expressed regret that Tibbetts had not received psychological intervention at that time. Dr. Weaver stated, in fact, that Tibbetts's inability to control his impulses at the time of the offenses was "a result of his [childhood] background." Later, Dr. Weaver and the prosecutor engaged in a heated exchange on this very point, with Dr. Weaver staunchly defending his position that Tibbetts's personality was largely formed in his early childhood when he suffered abuse and neglect, as opposed to in his teenage years when he began to abuse drugs.
We hold, therefore, that the jury was substantially informed that Tibbetts had a miserable and cruel childhood. We note further that when Tibbetts made his unsworn statement in mitigation, he did not so much lay the blame of his behavior on his childhood, but on his drug use. In Tibbetts's own words, "But I asked [God in prayer] a few times about my addiction. I said what is so bad in my life that I have to keep on doing this, you know, makes me keep going back to drinking and drugging, you know. Still comes up blank. I don't know. Because nobody forced me to do it, nobody put a gun in my hand, said you got to do it. I just do it. I don't know if it helps forgetting about the things that happened, or just to have a different life."
5. Constitutionality of Death by Electrocution
In his sixth claim for relief, Tibbetts claimed that death by electrocution constituted cruel and unusual punishment. We have previously rejected an identical argument. See Fautenberry, supra.
6. Evidence of Prior Giving of False Names
In his seventh claim for relief, Tibbetts asserted that his trial attorneys were ineffective for failing to develop and present evidence that he had previously given false names for unknown reasons when attempting to check into St. Elizabeth Hospital. Such evidence, according to Tibbetts, would have effectively negated the inference that he was trying to conceal his identity by using a false name when attempting to admit himself to St. Elizabeth days after the murders. According to Tibbetts, his giving of a false name at this time "was perhaps the most damaging fact presented at trial" against him. In Tibbetts's view, "[t]his one fact allowed the state to discredit [him] and to destroy his credibility."
We strongly disagree with the importance Tibbetts places on this bit of evidence. Even if we assume that he had been able to produce evidence that it was not unusual for him to give false names, for whatever reason, when admitting himself to St. Elizabeth, the latest episode was not the only instance in which he had apparently lied to cover up his role in the murders. According to the Covington police officers who testified at trial, Tibbetts had lied by telling him that the Geo Metro belonged to a friend of his in Covington, not to Fred Hicks. This act of blatant dissembling, more directly linked to the murders, strikes us as far more damaging than the false name he gave to St. Elizabeth. We agree with the trial court, therefore, that this claim did not warrant an evidentiary hearing.
7. The Failure to Exchange Exculpatory Evidence
In his eighth claim for relief, Tibbetts argued that the prosecution failed to exchange exculpatory evidence, specifically evidence of Crawford's previous convictions for "stabbings and violence against others." In support of this claim, Tibbetts presented his own affidavit, in which he stated that Crawford had "a long history of stabbing people." Tibbetts further identified three of Crawford's alleged stabbing victims and stated that Crawford had also "spent some time in the Penitentiary for cutting a woman with a beer bottle." He then added, "I would have provided all this information to my trial attorneys but they told me that they weren't going to investigate her background and that we weren't going into it at trial." Further, Tibbetts provided records of Crawford's conviction in Hamilton County Municipal Court, which had resulted from an act of disorderly conduct in a bar, and of another conviction for felonious assault that had stemmed from sticking a cue stick in the face of another woman.
We fail to find in the court records offered by Tibbetts evidence that Crawford had "a long history of stabbing people." The records concern only her convictions for disorderly conduct and felonious assault with a cue stick. The only evidence of her stabbing or cutting other people is Tibbetts's own self-serving affidavit, which, without more, was insufficient to establish a claim under Brady v. Maryland (1963),373 U.S. 83, 83 S.Ct. 1194. See State v. Kapper (1983), 5 Ohio St.3d 36,448 N.E.2d 823. If the state withheld evidence of prior stabbings, Tibbetts's materials failed to demonstrate it.
We note, furthermore, that Tibbetts testified during trial to two previous incidents in which, he claimed, Crawford had stabbed him when they were living together. Thus the jury was informed of these alleged incidents. It appears from his own affidavit that his trial attorneys made a tactical decision not to attempt to further attack the victim's character by linking her to other alleged stabbings, for which there might not have been any solid evidence. To pursue such an attack could have easily backfired. As for the potential mitigating value of evidence that Crawford had stabbed other people, even if it existed, its effect on the jury in a case involving two murders, each with multiple stab wounds, strikes us as arguable at best.
8. Failure of Trial Counsel to Investigate and Discover Crawford'sHistory of Assault
In his ninth claim for relief, Tibbetts argued that his trial attorneys were ineffective for failing to "investigate the background of the victim * * * and discover evidence of her prior history of violence against others, and in particular her history of stabbings." Again, however, Tibbetts referred principally to his own affidavit alleging the other incidents and other victims. The only official documentation was the records of Crawford's convictions for disorderly conduct and felonious assault for hitting someone in the face with a cue stick. As before, we do not find this evidence sufficiently compelling to warrant an evidentiary hearing or to establish that Tibbetts's trial attorneys were ineffective for failing to discover and produce it at trial.
9. The Trial Court Erred by Overruling Tibbetts's Motion to Suppress
In his tenth claim for relief, Tibbetts argued that the trial court erred by overruling his motion to suppress the statements he had made to the police at the Kenton County Jail. This claim was barred by the doctrine of res judicata, as it presented an issue that should have been dealt with on direct appeal. State v. Perry (1967), 10 Ohio St.2d 175,226 N.E.2d 104. Any new evidence on Tibbetts's capacity to waive his rights would not have demonstrated error by the trial court, which was limited to the record before it at the time of its decision.
10. The Effectiveness of Trial Counsel in Presenting the Motionto Suppress
In his eleventh claim for relief, Tibbetts argued that his trial attorneys were ineffective due to their "failure to investigate and present evidence of [his] extremely compromised mental condition at the time he made statements to arresting officers."
Tibbetts presented in support of this argument treatment records and admission orders arising from his stay at St. Elizabeth Hospital. According to Tibbetts, these records showed that he was experiencing "auditory hallucinations, acute alcohol withdrawal and suicidal ideation" and was "under the influence of a number of mind-altering drugs at the time he was arrested and interrogated." These documents also recorded, however, that Tibbetts's speech was "clear" and that he "answer[ed] questions appropriately." The only "auditory hallucinations" noted were voices telling Tibbetts to kill himself — no other hallucinatory experience was indicated. As for "mind-altering drugs," Tibbetts was noted as having a history of taking Percocet and Vicodin for a previous knee injury. Tibbetts also indicated that he had been drinking heavily over the previous week. The physician then wrote, "No other drugs perPt." At the hospital, Tibbetts was given Librium. Significantly, included among the records were two separate medical release forms (far more elaborate than a Miranda waiver), both signed by Tibbetts as Ray Harvey.
At the hearing on the motion to suppress, the interrogating officer stated that Tibbetts appeared to be "a little groggy" but was otherwise "calm" and very, very cooperative." According to the officer, "He [Tibbetts] stated that he had taken some medication earlier in the day at the hospital. He appeared to understand our questions. He, you know, answered the questions correctly, if you will." The officer testified that it was his opinion that Tibbetts understood his rights.
As we have noted, after Tibbetts was asked if he had seen his wife lately, he asked for an attorney and made clear that he did not wish to speak anymore with the detectives interviewing him. At that point, he was informed that the detectives would be leaving. Despite this clear exercise of his constitutional right to remain silent, Tibbetts now argues that he was too "mentally compromised" to understand that he possessed such a right. Frankly, we cannot understand how a person who intelligently exercised his right to halt questioning can seriously argue that he did not understand that he had a right to do so.
Further, we note that none of the hospital records provided any basis to conclude that Tibbetts was too "mentally compromised" to have understood his rights. Although Tibbetts argues that his trial attorneys should have presented psychological and pharmacological evidence that he did not understand his Miranda rights, there is no reason to believe that any pharmacologist or psychologist would have testified to this, and even if they had, Tibbetts's exercise of his rights would certainly have refuted such testimony.
11. The Trial Court's Decision To Admit, Over Objection, HearsayStatements of Tibbetts to Nurses at St. Elizabeth
In his twelfth claim for relief, Tibbetts argued that the trial court erred by admitting hearsay statements Tibbetts had made to the nurses at St. Elizabeth. This claim did not depend on any evidence outside of the record (the trial court's decision could only have been right or wrong depending upon the evidence before it) and was therefore barred by the doctrine of res judicata under Perry, supra. The issue was clearly one that should have been raised on direct appeal.
12. Trial Counsel's Alleged Failure to Investigate the Crime Scene
In his thirteenth claim for relief, Tibbetts argued that his trial attorneys were ineffective for failing to perform an adequate crime-scene investigation or to arrange for others to do such an investigation. As we have noted previously, there is absolutely no hard evidence that further crime-scene examination would have produced any exculpatory evidence. This claim is entirely speculative.
13. Constitutionality of Death by Lethal Injection
In his fourteenth claim for relief, Tibbetts argued that his conviction was void or voidable because if he chose to die by lethal injection rather than by electrocution, his punishment would have been cruel and unusual. As Tibbetts has the option of choosing death by electrocution, which the Ohio Supreme Court has ruled constitutional, see State v.Coleman (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633, this argument fails as a matter of law.
14. Failure to Allow Defense Examination of Crime Scene
In his fifteenth claim for relief, Tibbetts argued that the state withheld exculpatory evidence and denied him due process by not allowing him to investigate the crime scene. As we have noted, given the absence of anything to suggest that any material exculpatory evidence was to found by further investigation of the crime scene, this claim was purely speculative.
15. Conclusion
In sum, we hold that all fifteen claims presented by Tibbetts either were too speculative to warrant an evidentiary hearing, lacked materiality, were refuted by the record, or were precluded by the doctrine of res judicata. Hence, we hold that the trial court did not err by dismissing the claims without an evidentiary hearing. Tibbetts's second assignment of error is, therefore, overruled.
 THIRD ASSIGNMENT OF ERROR
In his third assignment of error, Tibbetts argues generally that the trial court erred by dismissing his claims either on their merits or on the basis of res judicata. This assignment is overruled upon the basis our discussion of each individual claim. While we agree with Tibbetts that a petitioner need not demonstrate his claims with certainty to obtain an evidentiary hearing, as we have stated repeatedly throughout this decision and in other cases, in order to warrant an evidentiary hearing, postconviction claims must start at a certain level of cogency and consist of more than mere hypothesis and a desire for further discovery. A claim that is based on what experts might have said had they been obtained, or on evidence that might have been found had further investigation been done, or on testimony from witnesses that might have been helpful, or on untried strategies that might have been successful, is not sufficient to trigger a process of discovery and relitigation.
Accordingly, Tibbetts's third assignment of error is overruled. The judgment of the trial court is affirmed.
 _________________________ GORMAN, Presiding Judge.
 HILDEBRANDT and WINKLER, JJ., concur.