OPINION
{¶ 1} Scott H. Stringham appeals from his conviction and sentence in the Miami County Court of Common Pleas on one count of first-degree murder.[1]
 {¶ 2} Stringham advances four assignments of error on appeal. First, he contends that the trial court erred in excluding expert testimony about false confessions. Second, he argues that the trial court erred in refusing to suppress incriminating statements he made to police. Third, he asserts that the trial court erred in failing to dismiss the case on the basis of a thirty-year delay between the commission of the crime at issue and his indictment. Fourth, he maintains that the trial court erred in refusing to dismiss the case on the basis of a conflict of interest involving his trial attorney.
 {¶ 3} The present appeal stems from the 1970 murder of an individual named Cecil Wayne Martin, in Miami County. On November 16, 1970, police discovered Martin's body in a creek. The body, which appeared to have been dumped from a road above the creek, had three bullet holes in the back and one in the cheek. A criminal investigation into Martin's death remained active for approximately one year. During that time, police failed to develop any leads, and Stringham was not mentioned as a suspect. The only forensic evidence discovered during the investigation was an unidentified fingerprint found on the inside passenger-side door of Martin's car. After failing to match the fingerprint to anyone, police closed the investigation.
 {¶ 4} Approximately thirty years later, Miami County police officer Steve Lord re-opened the murder investigation. In the course of his work, he had the unidentified fingerprint run through a computer database known as the Automated Fingerprint Identification System. The search matched the print to Stringham, who then was residing in Oklahoma City. Thereafter, Lord and detective Mark Humphrey traveled to Stringham's home in Oklahoma City, accompanied by a member of the Oklahoma City police department. Upon making contact with Stringham, the Oklahoma City officer asked him to come to the police station to talk. Stringham agreed, and a friend drove him to the Oklahoma City police station. Once there, Lord and Humphrey interviewed him about Martin's death. During the interview, Stringham stated that he, an AWOL Marine, and another man whose father had been on the New Carlisle City Council, had met Martin and were driving him to Yellow Springs to buy drugs. Stringham then told Lord and Humphrey that the occupants of the car had stopped to urinate and that he had seen the AWOL Marine shoot Martin while the car was stopped. Later during the interview, however, Stringham confessed that he actually had shot Martin himself. Following this confession, Stringham flew back to Ohio with the Miami County officers. During the trip, he contradicted his confession and insisted that the unidentified, AWOL Marine had shot Martin. Stringham subsequently was charged with one count of first-degree murder in connection with Martin's death. The matter proceeded to trial, and a jury found him guilty. The trial court sentenced Stringham to life in prison. He then filed a timely appeal, advancing the four assignments of error set forth above.
 {¶ 5} As a means of analysis, we turn first to Stringham's third assignment of error, as it raises an issue that would require the reversal of his conviction and preclude a retrial if he is correct. In his third assignment of error, Stringham contends that the thirty-year delay between the crime at issue and his indictment resulted in a violation of his constitutional right to due process of law. This argument implicates United States v. Marion (1971), 404 U.S. 307. Therein, the U.S. Supreme Court recognized that pre-indictment delay constitutes a due process violation if (1) the delay results in actual prejudice to the defendant and (2) the State lacks a justifiable reason for the delay. See also State v. Luck (1984), 15 Ohio St.3d 150
(recognizing a due process violation when an unjustifiable delay between the commission of an offense and an ensuing indictment results in actual prejudice to a defendant).
 {¶ 6} Upon review, we find Stringham's third assignment of error to be unpersuasive, as the record is devoid of evidence that the thirty-year delay resulted in any actual prejudice. As noted above, the State's evidence in this case consisted primarily of (1) Stringham's fingerprint found in the victim's car and (2) Stringham's confession that he killed the victim. Notably, the passage of time does not appear to have had any impact on the quality or credibility of this evidence.
 {¶ 7} Stringham argues, however, that the delay between the crime at issue and his indictment prejudiced him in several ways. First, he reasons that "the passage of time alone" prejudiced his defense. Second, he contends that he can no longer remember where he was on the night in question, thereby precluding him from presenting alibi witnesses. Third, he reasons that "hypothetical" witnesses might be dead or might have "vanished" by now. Fourth, he contends that the passage of time has prevented him from locating other suspects who may have committed the crime.
 {¶ 8} Upon review, we are unpersuaded by Stringham's arguments. As an initial matter, the mere passage of time, standing alone, cannot result in prejudice per se. Indeed, such a rule would eviscerate the "actual prejudice" component of the two-part test set forth above by conflating it with the "delay" prong of the analysis. Likewise, Stringham cannot demonstrate "actual" prejudice by resorting to an argument about "hypothetical" witnesses. Absent his identification of any particular witness who either died or "vanished," we find his argument to be without merit. We also find no actual prejudice resulting from Stringham's assertion of a faded memory and an inability to locate other potential suspects. In State v. Collins (1997), 118 Ohio App.3d 73, 76-77, we noted that "[a]ny claim of prejudice, such as the death of a key witness, lost evidence, or faded memories, must be balanced against the other evidence in order to determine whether actual prejudice will be suffered by the defendant at trial." When Stringham's confession and the government's fingerprint evidence are balanced against his assertion of a faded memory and an inability to locate other unidentified suspects, we find no actual prejudice. Even if he had been indicted sooner, we find it extremely unlikely that Stringham would have recalled anything or found other suspects that would have minimized the impact of the government's evidence against him, which included a confession that he killed Cecil Wayne Martin. Cf. Luck, 15 Ohio St.3d at 157. Accordingly, we overrule his third assignment of error.
 {¶ 9} We turn next to Stringham's second assignment of error, in which he contends the trial court erred in failing to suppress statements he made to police, including his confession to murder. Stringham first asserts that his statements should have been suppressed on the basis that they were not given voluntarily. This argument requires an analysis of his interview with officers Lord and Humphrey at the Oklahoma City police station. As noted above, Stringham met with the officers and, in the course of the meeting, confessed to killing Cecil Martin. On appeal, Stringham insists that his confession was coerced and was not the product of his free will. In particular, he alleges that Lord created an environment that forced him to confess, downplayed the seriousness of his offense, exaggerated the evidence against him, implied that he would not be prosecuted, suggested that he could work something out with the prosecutor and the judge if he would confess, stated that he could do more for Stringham than an attorney, and offered to help him in exchange for a confession. In addition, Stringham notes that his interview lasted roughly two hours and took place in a small room with the door closed. He also stresses that he lacked social skills, admitted having consumed alcohol prior to the interview, and was taking medication for social anxiety.
 {¶ 10} Having reviewed the full videotape of Stringham's interview with Lord and Humphrey, we find no error in the trial court's determination that all of his statements, including his confession, were made voluntarily. In reaching this conclusion, we note that whether a confession is voluntary and whether a suspect has been subjected to custodial interrogation so as to require Miranda warnings are analytically separate issues.[2] Dickerson v. United States (2000),530 U.S. 428; State v. Chase (1978), 55 Ohio St.2d 237, 246. The Due Process Clause requires an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession. Dickerson,530 U.S. at 434. This due process test takes into consideration the totality of the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation. Id. Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements. State v. Edwards (1976),49 Ohio St.2d 31, vacated on other grounds, Edwards v. Ohio (1978),438 U.S. 911.
 {¶ 11} Even when Miranda warnings are not required, a confession may be involuntary and subject to exclusion if, under the totality of the circumstances, the defendant's will was overborne by the circumstances surrounding the giving of his confession. Dickerson, 530 U.S. at 434. If the attendant circumstances indicate that a confession was coerced or compelled, it cannot be used to convict the defendant. That determination depends on a weighing of the pressure to confess against the power of resistance of the person confessing. Id. In State v. Otte,74 Ohio St.3d 555, 562, 1996-Ohio-108, the Ohio Supreme Court articulated the prevailing legal standard for determining voluntariness: "A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." The voluntariness of a confession is a question of law that an appellate court reviews de novo. Arizona v. Fulminante (1991), 499 U.S. 279,287; State v. Waldo, Champaign App. No. 99CA24, 2001-Ohio-1349.
 {¶ 12} In the present case, the evidence fully supports the trial court's determination that Stringham's decision to waive his Fifth Amendment privilege against self-incrimination was made voluntarily. The record reflects that Stringham was fifty years old at the time of his confession, and he had some prior experience with the criminal justice system, as indicated by his multiple arrests for driving under the influence of alcohol and at least one arrest for drug possession. Although Stringham stated that he had been drinking on the day of his interview, the videotape does not reflect any resulting impairment to his functioning or thought processes. Stringham also stated that he took medication to control anxiety, and he did appear to be extremely nervous, particularly early in his meeting with Lord and Humphrey. Once again, however, Stringham appears to have been lucid and fully capable of reasoning and making his own decisions. Notably, near the end of his interview with the two officers, Stringham expressly denied that his mental state had any impact on the giving of his confession.
 {¶ 13} We note too that the length, intensity, and frequency of Stringham's meeting with Lord and Humphrey militate against a finding that his confession was involuntary. Stringham's interview, which lasted approximately two hours, was not particularly lengthy. Officer Lord, who conducted most of the questioning, spoke with Stringham in a conversational manner, and the tone of the dialogue between the two men was, as the trial court observed, "remarkably benign." Additionally, we note that Stringham was interviewed only once and was informed at the outset that he was free to leave. In short, we find nothing coercive or overbearing about the physical circumstances of the interview. We also find no evidence that Stringham was physically deprived of anything or mistreated. In this regard, we note that he was provided with coffee and water to drink, he was not denied anything, and he was not physically threatened or harmed.
 {¶ 14} Most of Stringham's arguments on appeal concern things Lord said to him during the interview. As noted above, he contends that Lord downplayed the seriousness of his offense, exaggerated the evidence against him, implied that he would not be prosecuted, suggested that he could work something out if he would confess, stated that he could do more for Stringham than an attorney, and offered to "help" him in exchange for a confession.
 {¶ 15} Upon review, we find the foregoing arguments to be unpersuasive. The record reflects that Lord did exaggerate his knowledge of Stringham's involvement in the crime, falsely stating that extensive forensic evidence had been collected.[3] He also attempted to downplay the seriousness of the offense, explaining that the situation might not be as bad as Stringham thought. Lord additionally expressed a desire to "help" Stringham and advised him to "make the best out of a bad situation." In addition, Lord raised the possibility that Stringham might have acted in self defense.[4] He also explained that the situation was not "going away" and expressed a belief that Stringham was not the man that he had been thirty years earlier. Lord also advised him to tell the truth and suggested that he should "help" himself out of a bad situation.
 {¶ 16} In our view, none of the foregoing word or actions by Lord caused Stringham's free will to be overborne or otherwise resulted in a coerced confession. In reaching this conclusion, we note that deceit and misrepresentations about the evidence police possess do not per se render a confession involuntary. Rather, such conduct by an investigating officer is but one factor bearing on voluntariness. State v. Reeves, Greene App. No. 2002-CA-9, 2002-Ohio-4810; see also State v. Bays,87 Ohio St.3d 15, 23, 1999-Ohio-216, quoting Ledbetter v. Edwards (6th Cir. 1994), 35 F.3d 1062, 1070 (reasoning that "[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is'"). In addition, admonitions to tell the truth are considered neither threats nor promises and are permissible. State v. Loza (1994), 71 Ohio St.3d 61, 67; Statev. Cooey (1989), 46 Ohio St.3d 20, 28. Similarly, assurances that a defendant's cooperation will be considered or that a confession will be helpful do not invalidate a confession. Loza, 71 Ohio St.3d at 67; see also State v. Wilson (1996), 117 Ohio App.3d 290, 294 ("Promises that a defendant's cooperation will be considered in disposition of the case, or that a confession will be helpful, do not invalidate an otherwise legal confession."). As we recently recognized in State v. Farley, Miami App. No. 2002-CA-2, 2002-Ohio-6192, a mere suggestion that cooperation may result in more lenient treatment is neither misleading nor unduly coercive, as people "convicted of criminal offenses generally are dealt with more leniently when they have cooperated with the authorities." See also State v. Bailey (March 31, 1995), Miami App. No. 94 CA 39 (finding a statement that the defendant "could help himself" by speaking with investigators not impermissibly coercive because "the advice was non-specific as to how making a statement would be advantageous"). Likewise, an investigator's offer to "help" if a defendant confesses is not improper. Chase, 55 Ohio St.2d at 247; see also Wilson,117 Ohio App.3d at 294. In short, we find nothing inherently wrong with Lord's efforts to create a favorable environment for a confession, and none of foregoing tactics were so coercive as to violate Stringham's Fifth Amendment rights.
 {¶ 17} Two other issues raised by Stringham warrant closer analysis. On appeal, Stringham objects to an analogy Lord made about a hypothetical store manager caught on videotape stealing from a cash register. Lord depicted two scenarios. Under the first scenario, the manager steadfastly denied stealing from the cash register, despite his employer's knowledge that he had done so. Under the second scenario, the manager admitted stealing from the cash register, expressed remorse, and explained that he had acted out of necessity. After reviewing these two scenarios, Lord suggested that under the second scenario the manager might be permitted to keep his job, whereas under the first scenario the employer would not be inclined to work with the manager by trying to help him keep his job and maybe avoid prosecution.
 {¶ 18} Stringham also objects to a statement that Lord made shortly after he admitted being present during the murder and identified the AWOL Marine as the shooter. After this partial admission, Lord expressed his opinion that Stringham was not telling the entire truth. At that point, Stringham asked: "Isn't this the time that I'm supposed to say I want my attorney?" Lord responded that Stringham had a right to an attorney but stated: "I can do more for you with the prosecutor than an attorney can." Shortly thereafter, Stringham admitted that he actually shot Cecil Martin. On appeal, he insists that Lord's "egregious" comment about being able to help more than an attorney "effectively undercut any attempt by appellant to invoke his constitutional right to counsel." See Appellant's Brief at 28.
 {¶ 19} Upon review, we cannot agree that either of the foregoing incidents, when viewed in light of the totality of the circumstances, rendered Stringham's confession involuntary. With regard to Lord's analogy, we do not encourage using a hypothetical involving a minor theft offense to illustrate the advantages of admitting guilt in a case involving a potential first-degree murder. Notably, however, Lord prefaced the analogy by explaining that it would demonstrate the importance of knowing why a crime occurred. Lord used the analogy to illustrate the concept that cooperation may result in more lenient treatment if an individual confesses and provides a good explanation for his actions. As noted above, a general suggestion that cooperation may result in more lenient treatment is neither misleading nor unduly coercive. Farley, Miami App. No. 2002-CA-2; see also Wilson,117 Ohio App.3d at 294 (noting that "a suggestion of leniency by the police is not enough to invalidate a confession, but would merely be a factor bearing on whether the confession was voluntary"). In our view, it would be unreasonable for a person in Stringham's position to have inferred from Lord's analogy that he would not be prosecuted if he confessed to first-degree murder.[5] In concluding that the analogy did not result in Stringham's free will being overborne, we draw additional support from a statement that he made near the end of his interview. When asked why he confessed, Stringham did not suggest that he did so because of a belief that he might not be prosecuted if he cooperated. Nor did he say that he confessed because of any inducement offered by the officers. Rather, he suggested that he confessed because it was the right thing to do.
 {¶ 20} We note too that the present case is a far cry from Statev. Petitjean (2000), 140 Ohio App.3d 517, in which police told the defendant that he was facing a murder charge and that if they had to gather evidence against him through an investigation, "you go bye bye for life, or lose your life." Alternatively, they told him that if he would "work with us and work with yourself," then he would "probably get two years of probation." In Petitjean, we held that the defendant's ensuing confession was involuntary. The officers' statement specifically conditioned the availability of probation on the defendant's waiver of his Fifth Amendment right. The probation alternative presented to the defendant was so remote from reality as to be illusory, and it was a misstatement of the law because probation was unavailable for the offense at issue. Judged against the alternative the officers gave the defendant, the prospect of the death penalty or life in prison if he remained silent, we concluded that the false hope created by their suggestion of more lenient treatment critically impaired his capacity for self-determination. Id. at 533-534 (recognizing that "false promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines the suspect's capacity for self-determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired").
 {¶ 21} In other cases, this court similarly has noted that false promises or suggestions of leniency involving a misstatement of the law have the ability to render a confession involuntary.[6] See, e.g.,State v. Jackson, Greene App. No. 02CA0001, 2002-Ohio-4680, quoting Statev. Arrington (1984), 14 Ohio App.3d 111, at paragraph two of the syllabus ("`Where an accused's decision to speak was motivated by police officers' statements constituting `direct or implied promises' for leniency or benefit or other representations regarding the possibility of probation which were misstatements of the law, his incriminating statements, not being freely self-determined, were improperly induced, involuntary and inadmissible as a matter of law.'"); Farley, Miami App. No. 2002-CA-2 (distinguishing Petitjean and Arrington on the basis that they involved confessions which were induced by misrepresentations that the defendant likely would receive probation when it was not a realistic possibility). In the present case, however, neither Lord nor Humphrey made any false promises or misstatements of the law that resulted in Stringham's free will being overborne or critically affected his capacity for self-determination.
 {¶ 22} Finally, Lord's comment about being able to "do more" for Stringham with the prosecutor than an attorney did not render his subsequent confession involuntary. As an initial matter, we note that Stringham was not in custody when Lord made this remark. Consequently, noMiranda issue exists with respect to the remark, and we find no merit in Stringham's assertion that the comment "effectively undercut any attempt . . . to invoke his constitutional right to counsel." Furthermore, Stringham's inquiry about whether he should ask for an attorney is far from an unambiguous and unequivocal assertion of the right to counsel. In any event, Lord did tell Stringham that he could have access to an attorney if he wanted one. With regard to Lord's questionable contention that he could "do more" for Stringham than an attorney, this remark constituted neither a specific false promise nor a misstatement of the law and, under the totality of the circumstances, we find that it was too vague to overcome his free will or to critically impair his capacity for self-determination. Cf. State v. Bailey (March 31, 1995), Miami App. No. 94 CA 39 (finding a vague remark that the defendant "could help himself" by speaking with investigators was not impermissibly coercive). As a result, the comment did not render Stringham's confession involuntary. In summary, having reviewed the entire videotape at issue, we conclude that Stringham's free will was not overborne, and the evidence fully supports that trial court's determination that all of his statements, including his confession, were voluntarily made and were not the product of police coercion.
 {¶ 23} In a second argument, however, Stringham insists that he was in custody and was subject to interrogation when he confessed to shooting Cecil Martin. As a result, he argues that the trial court should have suppressed that portion of his confession, as he had not been advised of his rights under Miranda v. Arizona (1966), 384 U.S. 436. With regard to this argument, Stringham concedes that he was not in custody during the first part of his interview with officers Lord and Humphrey. See Appellant's Brief at 31-32. As a result, he recognizes that the officers initially were not required to advise him of his Miranda
rights. Stringham argues, however, that his non-custodial status changed midway through the interview when he told the officers that he had seen an AWOL Marine shoot Martin. Although Stringham had not yet identified himself as the shooter, he contends that "the officers certainly would not have let him leave after he admitted to being present while someone else murdered Martin." Id. at 32. In support, Stringham reasons that the officers then knew, at a minimum, that he was guilty of failing to report a crime in violation of R.C. § 2921.22(A), a fourth-degree misdemeanor offense. As a result, he contends that Lord and Humphrey were obligated to inform him of his Miranda rights at that time. Given their failure to do so, he argues that his subsequent confession to shooting Cecil Martin should have been suppressed.
 {¶ 24} Upon review, we find the foregoing argument to be unpersuasive. At the outset, we agree with Stringham that he was not in custody prior to making his statement about the AWOL Marine shooting Martin. The record reflects that he voluntarily met with Lord and Humphrey, who informed him that he was not under arrest and that he was free to leave the police station at any time. Having reviewed the entire videotape of Stringham's meeting with the two officers, we also conclude that his statement about seeing an AWOL Marine shoot Martin did not alter the non-custodial nature of the meeting. It is well settled that Miranda
warnings are only required as a predicate for custodial interrogation. Neither the fact that one is a suspect, nor the fact that one is being questioned at a police station requires a finding of custodial interrogation. Oregon v. Mathiason (1977), 429 U.S. 492, 495. When assessing whether a defendant was "in custody" for purposes of Miranda, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty
(1984), 468 U.S. 420, 442. "The issue is whether an objectively reasonable person in the defendant's position would have understood that he was in custody, and was likely to remain in custody for more than a short period of time[.]" State v. McCrary, Montgomery App. No. 18885,2002-Ohio-396.
 {¶ 25} In our view, an objectively reasonable person in Stringham's position would not have believed that he was in custody as a result of admitting that he had witnessed a murder thirty years earlier. As noted above, Stringham plainly was not in custody prior to making this statement, which did not implicate him in killing Martin or in moving the body. With regard to Stringham's reliance on R.C. § 2921.22(A), we not that this statute was not enacted until 1972. Consequently, he could not have violated § 2921.22(A) by failing to report Martin's death in 1970. We do note, however, that Stringham's statement about seeing the AWOL Marine shoot Martin may have rendered him guilty of violating the former R.C. § 2917.44, which was enacted in 1961 and was the predecessor to R.C. § 2921.22(A). In any event, as Stringham recognizes, failure to report a felony is a misdemeanor offense. In Statev. Singleton (March 31, 1999), Montgomery App. Nos. 17003 and 17004, we declined to hold that "a defendant who confesses to a crime at a police station is necessarily in custody immediately thereafter." Rather, we noted that "[w]hether the defendant is thereafter in custody depends on the circumstances, particularly the crime confessed to." Id. In the present case, we do not believe that a reasonable person in Stringham's position would have expected to be in custody after admitting facts that may have constituted a thirty-year-old misdemeanor offense. As a result, the record supports the trial court's determination that Stringham was not in custody immediately after he admitted having seen an AWOL Marine shoot Martin. Therefore, the requirements of Miranda did not apply, and we overrule his second assignment of error.
 {¶ 26} Having found that Stringham's confession was voluntary and that it was not the product of a Miranda violation, we turn now to his first assignment of error, in which he contends the trial court erred in excluding expert testimony about false confessions. This argument concerns the proposed testimony of Dr. Douglas Mossman. At the trial court's direction, defense counsel questioned Mossman outside the presence of the jury for purposes of determining the admissibility of his testimony. Based on our review of the transcript, it appears that Mossman was prepared to testify about psychological reasons why a person might make a false confession and psychological traits, diagnoses, or characteristics that make certain people susceptible to giving a false confession. In addition, Mossman would have testified concerning the extent to which his examination and testing of Stringham revealed the presence of such traits, diagnoses, or characteristics. Mossman repeatedly indicated that he had no intention of testifying about whether Stringham's confession was "voluntary" in the legal sense. Rather, he explained that his testimony would help the jury assess the reliability or credibility of Stringham's confession. In other words, Mossman indicated that he intended to address situations in which a confession might be purely voluntary yet false. Mossman also explained that he did not intend to opine as to whether he personally believed Stringham's confession was true or false. See generally Trial Transcript Vol. III at 510-558.
 {¶ 27} After initially finding that much of the foregoing testimony would be admissible, the trial court reconsidered and declared all of Mossman's proposed testimony to be inadmissible. Id. at 531-532, 544. At that point, defense counsel conducted another examination of Mossman outside the presence of the jury and made a proffer for the record. During the proffer, Mossman explained once again that his testimony would address his evaluation and testing of Stringham, including diagnoses of psychotipal personality disorder, alcohol dependence, and marijuana abuse. Mossman also explained that he would testify about various types of false confessions and studies involving them. In addition, Mossman indicated that he would testify about methods of police interrogation and physical settings that may result in certain individuals making false confessions, as well as psychological traits or qualities that may cause individuals to confess falsely. Finally, Mossman stated that he would testify about which traits or qualities he found to be present in Stringham. In particular, Mossman anticipated testifying about "factors having to do with Mr. Stringham and . . . his psychological vulnerabilities, how his diagnosis and his condition that day influenced his susceptibility and then factors that were present during the interview in terms of the interrogators' conduct." Id. at 544-554. After hearing the foregoing proffer, the trial court excluded Mossman's testimony, in its entirety, primarily on the basis of State v.Loza (1994), 71 Ohio St.3d 61. Thereafter, on March 14, 2002, the trial court journalized a written decision sustaining the State's motion in limine to exclude Mossman's proposed testimony. See Doc. #94.
 {¶ 28} On appeal, Stringham argues that the trial court's exclusion of Mossman's testimony violates Crane v. Kentucky, 476 U.S. 683
(1986). In Crane, the U.S. Supreme Court recognized that while a trial court has the duty to determine whether a confession is voluntary, a jury has the duty to assess its reliability. Crane, 476 U.S. at 688. TheCrane Court reasoned as follows:
 {¶ 29} "The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be `insufficiently corroborated or otherwise . . . unworthy of belief.' Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." Id. at 688-689 (citations omitted).
 {¶ 30} After distinguishing the voluntariness of a confession from the reliability of that confession, the Crane Court recognized a criminal defendant's general constitutional right to present competent, credible evidence that bears on the reliability of his confession:
 {¶ 31} "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants `a meaningful opportunity to present a complete defense.' We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and `survive the crucible of meaningful adversarial testing.'" Id. at 690-691.
 {¶ 32} In light of the foregoing principles, the Crane Court held that the lower courts had erred in excluding testimony about the environment in which police had secured the defendant's confession. In reaching this conclusion, the Court noted that evidence about the manner in which a confession is obtained may be highly relevant to its reliability or credibility. The Court also noted that the defendant's entire defense was that no physical evidence existed and that his confession should not be believed. Under such circumstances, the Court found "it plain that introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance" of the defendant prevailing at trial. Id. at 691. Absent a valid state justification for the wholesale exclusion of evidence concerning the physical circumstances that surrounded the confession, the Crane Court held that exclusion of such evidence violated the defendant's constitutional right to present a defense. Id.
 {¶ 33} In the present case, the trial court distinguished Crane on the basis that it did not involve the use of expert testimony. Rather,Crane involved proposed lay testimony from two police officers about the size and physical characteristics of the interview room, the length of the interview, and other details about the taking of the confession.Crane, 476 U.S. at 686. The trial court also distinguished Crane on the basis that it primarily involved testimony about the physical environment surrounding the confession, whereas Stringham sought to introduce expert testimony about how psychological traits or diagnoses may contribute to the making of a false confession. Doc. #94 at 2. In particular, the trial court reasoned:
 {¶ 34} "It is not the interrogation environment which the Defendant seeks to submit to the jury but his own psychological make-up which he claims makes his confession(s) false. However (sic) it is argued, it appears to involve the issue of voluntariness of the confession, or the expert's opinion on the Defendant's veracity." Id. at 2.
 {¶ 35} In support of its decision, the trial court relied on the Ohio Supreme Court's per curiam opinion in State v. Loza (1994),71 Ohio St.3d 61, a death penalty case that contained thirty-three propositions of law. In its analysis of the first proposition of law, theLoza court framed the issue raised by the appellant as whether "psychological testimony concerning the voluntariness of his confession should have been admitted during the guilt phase of his trial." Id. at 65. The Loza court then engaged in an analysis that, in our view, Stringham correctly has characterized as being "at best confusing."[7]
Given the belief by both the trial court and the State that Loza is dispositive of the issue before us, we will set forth the Loza court's analysis in full. In addressing the appellant's first proposition of law, the Loza court reasoned as follows:
 {¶ 36} "In his first proposition of law, appellant asserts that psychological testimony concerning the voluntariness of his confession should have been admitted during the guilt phase of his trial.
 {¶ 37} "The trial court did not permit the jury to hear testimony of Dr. Roger Fisher, a clinical psychologist, who would have testified that appellant's confession resulted from police coercion and duress caused by statements made by the police officers during the interrogation. Dr. Fisher would have testified that, in his opinion, appellant confessed because his background, psychological makeup, and his personal code of conduct required that he not `snitch' and that he `protect Dorothy.' Dr. Fisher would have testified that because Loza had a difficult childhood he was compelled to confess to protect his girlfriend and unborn child. The trial court concluded that since it had made a pretrial determination that Loza's confession was voluntary, Dr. Fisher's testimony was not appropriate during the guilt phase.
 {¶ 38} "Appellant argues that Crane v. Kentucky (1986),476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636, requires the admission of Dr. Fisher's testimony. In Crane, a sixteen-year-old defendant sought to introduce testimony regarding the psychological impact of the length of his interrogation and the manner in which it was conducted. The United States Supreme Court held that the exclusion of the testimony about the circumstances of the defendant's confession deprived him of his fundamental constitutional right to a fair opportunity to present a defense. The court recognized that while the issue of whether a confession is voluntary is a question of law for the court, the jury was entitled to hear the excluded testimony in order to make a factual determination of whether the manner in which the confession was obtained cast doubts on its credibility. Id. at 689, 106 S.Ct. at 2146,90 L.Ed.2d at 644.
 {¶ 39} "The testimony of Dr. Fisher is clearly outside the holding of Crane. The testimony of the witnesses in Crane related to how the physical and psychological environment of the interrogation could have impacted the voluntariness and credibility of the confession. Dr. Fisher's proffered testimony relates to how Loza's individual, psychological makeup, independent of the circumstances surrounding the interrogation, could have impacted the voluntariness and credibility of the confession. Consequently, Crane does not require the admission of Dr. Fisher's testimony."The jury was able to accurately consider the credibility and weight of the confession by watching it on videotape. They could see and hear the tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation. The jury had the opportunity to evaluate the credibility of the appellant and to give the confession its appropriate probative weight. See State v. Jamison (1990),49 Ohio St.3d 182, 191, 552 N.E.2d 180, 189 (the weight to be given evidence and the credibility of witnesses are jury issues). Because the trial court already had ruled on the voluntariness of the confession and the jury had the opportunity to evaluate the credibility of the confession, the trial court did not abuse its discretion by excluding the testimony of Dr. Fisher during the guilt phase of the trial.This proposition of law is overruled." Id. at 65-66.
 {¶ 40} Having studied the foregoing analysis at length, we note, most importantly, that the Ohio Supreme Court narrowly defined the issue before it as whether "psychological testimony concerning the voluntariness of [the appellant's] confession should have been admitted during the guilt phase of his trial." Loza, 71 Ohio St.3d at 65. The answer to this question is plainly "no." It is well settled in most states, including Ohio, that the voluntariness of a confession a question of law for the trial court to decide, typically through a pre-trial motion to suppress. Crane, 476 U.S. at 682 (recognizing "the requirement that the court make a pretrial voluntariness determination"). As a result, if the sole issue is the voluntariness of a confession, evidence on that issue has no place in a jury trial. Consequently, given the issue framed by the Loza Court, there is no question that it reached the correct result in overruling the appellant's first proposition of law.
 {¶ 41} In the present case, however, Stringham did not seek to introduce Mossman's testimony to challenge the voluntariness of his confession. Rather, as noted above, Stringham sought to use the doctor's testimony only to assist the jury in assessing the reliability orcredibility of his confession. Insofar as the trial court found that Mossman's testimony related to the lone issue of voluntariness, and therefore was inadmissible, we believe that the trial court erred. See Doc. #94 at 2. In our view, Mossman plainly distinguished the voluntariness of a confession from the reliability or credibility of that confession. In essence, he proposed to testify about psychological reasons why a person would give a voluntary yet completely false confession. Mossman's testimony concerned the peculiar phenomenon of individuals telling voluntary lies to implicate themselves in crimes that they did not commit. As set forth more fully above, Mossman proposed to testify about psychologically based reasons why people might engage in such behavior. He also proposed to testify about the psychological traits, diagnoses, or characteristics observed in people who voluntarily, yet falsely, implicate themselves in crimes. In addition, he proposed to testify about his own testing and examinations of Stringham, which revealed the presence of such traits, diagnoses, or characteristics.
 {¶ 42} In our view, the foregoing testimony had a bearing on the reliability or credibility of Stringham's confession, and it was central to his defense.[8] As a result, absent any valid justification for excluding the testimony (and the State has not asserted any such justification), we find that the wholesale exclusion of Mossman's testimony violated Stringham's constitutional right to present a defense.[9] Crane, 476 U.S. at 690. Indeed, the trial court's exclusion of Mossman's testimony precluded him from "answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" Crane, 476 U.S. at 689.
 {¶ 43} Although Crane involved the physical and psychological environment of a confession and the impact that environment had on its reliability, the legal principle articulated by the U.S. Supreme Court is broader than Crane's facts. Indeed, the Crane Court recognized that a criminal defendant enjoys a general constitutional right to introduce any competent, reliable evidence bearing on the credibility of his confession, when such evidence is central to his claim of innocence and in the absence of a valid state justification for its exclusion. Id. at 690. Thus, we are unpersuaded by the trial court's attempt to distinguishCrane on the basis that the defendant therein sought to introduce evidence of the environment surrounding his confession, whereas Stringham sought to introduce expert testimony about certain psychological traits, diagnoses, or characteristics and their impact on the reliability of a confession. In both Crane and the present case, the defendant sought to introduce presumably competent, reliable evidence to explain why he confessed to something that he did not do.[10] Likewise, in both cases the evidence was crucial to the defense, and it had a bearing on the reliability of the confession. Finally, in neither case did the State offer a valid justification for the wholesale exclusion of such evidence.
 {¶ 44} Notably, we are not alone in our view that Crane extends to cases other than those in which the evidence at issue concerns the environment that yielded the confession. See, e.g., Holloman v. Kentucky
(Ky. 2001), 37 S.W.3d 764 (finding reversible error in the exclusion of expert testimony that the defendant's mental retardation made him vulnerable to suggestibility, manipulation and intimidation, as such testimony had a bearing on the reliability of his confession and was admissible under Crane); State v. Miller (June 17, 1997),86 Wash. App. 1064, 1997 WL 328740 (relying on Crane to find that the trial court erred in excluding expert testimony about "how and why someone could make a falsely incriminating statement");[11] Michigan v. Hamilton (1987),163 Mich. App. 661, 666 ("Crane did not concern evidence of the defendant's psychological makeup, but focused instead on the physical and psychological aspects of an interrogation. Nonetheless, we believe the United States Supreme Court's reasoning is equally applicable to otherwise admissible expert testimony.").[12]
 {¶ 45} In any event, we see no reason why Stringham's own psychological traits, diagnoses, or characteristics would not constitute part of the overall psychological environment that contributed to his confession and had a bearing on its reliability.[13] See Crane,476 U.S. at 689 (recognizing that "the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence). In an analogous case, Pritchett v. Virginia (2002), 263 Va. 182, the Virginia Supreme Court recently held that the trial court erred in excluding expert psychological testimony about "two factors which characterize people who `may be prone . . . to false confessions[.]'" Id. at 185. In that case, two experts proffered testimony that the defendant was mildly retarded and that, as a result, he was prone to be compliant and to be vulnerable to "interrogative suggestibility." Id. The state court of appeals affirmed the trial court's exclusion of the testimony, but the Virginia Supreme Court reversed on the basis of Crane. In so doing, the Virginia high court appears to have found that the expert testimony pertained to the psychological environment that yielded the confession. Id. at 186. The Pritchett court also found that the expert testimony was admissible, as it assisted the jury in evaluating the reliability of the defendant's confession. Id.; see also State v. Buechler (1998),253 Neb. 727, 738-739 (reasoning that under Crane a psychologist should have been allowed to testify that the defendant's drug withdrawal and psychological disorders may have resulted in a false confession, as such testimony pertained to the psychological circumstances under which he confessed and had a bearing on the reliability of the confession); Peoplev. Lopez (1997), 946 P.2d 478 (reversing the trial court and finding, based on Crane, that a psychologist's expert testimony was admissible, as it related to the "psychological environment surrounding the interrogation" and had a bearing on the reliability of the defendant's confession).
 {¶ 46} Finally, we disagree with the trial court's determination that Mossman's proposed testimony was inadmissible, as it constituted "the expert's opinion on [Stringham's] veracity." See Doc. #94 at 2. It is well settled that an expert witness may not render a personal opinion as to whether a particular witness is telling the truth. See, e.g., Statev. Boston (1989), 46 Ohio St.3d 108. However, an expert witness may provide testimony that assists the jury in making its own assessment of a witness' credibility or veracity. State v. Stowers, 81 Ohio St.3d 260,1998-Ohio-632. In the present case, it does not appear that Mossman would have provided his own opinion about whether Stringham's confession was reliable. Rather, he would have provided relevant information better enabling the jury itself, as the trier of fact, to evaluate the reliability of the confession.[14] Such testimony is proper under Ohio law.[15] Consequently, the trial court erred in excluding Mossman's proposed testimony on the basis that it constituted an improper comment on Stringham's veracity. Accordingly, we sustain Stringham's first assignment of error.
 {¶ 47} In his fourth assignment of error, Stringham contends the trial court erred in overruling a motion to dismiss his indictment on the basis of a conflict of interest involving his court-appointed attorney. It appears from the record that Stringham initially was represented by public defender Steve Layman. In July, 2001, Layman also represented a jail inmate named Michael Spann. Around that time, Spann and two other inmates, Vance Short and Dwan Ward, contacted officer Lord and told him that Stringham had admitted killing Cecil Martin.[16] After discovering Spann's cooperation with Lord, Layman declared a conflict of interest and had himself removed from Spann's case. On appeal, Stringham contends that Layman also represented Short, who already had been sentenced when Layman discovered his cooperation with Lord. In addition, Stringham contends that another attorney in the same public defender's office represented Ward. In light of these facts, he argues that there was a conflict of interest, which should have resulted in the entire public defender's office disassociating itself from Short and Ward. See Appellant's Brief at 39.
 {¶ 48} Upon review, we overrule Stringham's fourth assignment of error, as moot, given that we are reversing his conviction and remanding this matter for a new trial. We are confident that the trial court will address any conflict-of-interest issue on remand, if necessary, and conduct an appropriate inquiry if the issue arises.
 {¶ 49} Based on the reasoning and citation of authority set forth above, we hereby sustain Stringham's first assignment of error, reverse the judgment of the trial court, and remand this cause for further proceedings consistent with this opinion.
 {¶ 50} Judgment reversed and cause remanded.
GRADY, J., and YOUNG, J., concur.
[1] Given that the crime occurred in 1970, Stringham was indicted under R.C. 2901.01(A)(1) as it then existed. See Doc. #1.
[2] For this reason, we will address Stringham's separate argument regarding the applicability of Miranda, infra, after determining whether his confession was voluntary.
[3] In reality, investigators had obtained little more than Stringham's fingerprint from inside Cecil Martin's car.
[4] We note that Lord merely raised this idea as a possibility. In any event, it is apparent that this suggestion did not induce Stringham to confess, as his subsequent version of the facts did not support a self-defense claim. To the contrary, Stringham admitted shooting Cecil Martin at point-blank range to facilitate the theft of his car.
[5] Parenthetically, we question whether Stringham even understood the analogy or paid attention to it. During the interview, he appeared to be confused and was slow to respond when Lord attempted to discuss the analogy with him.
[6] In Edwards, 49 Ohio St.2d at 41, the Ohio Supreme Court noted that "the presence of promises does not as a matter of law render a confession involuntary." Rather, promises made by investigating officers are only one factor to consider under a totality-of-the-circumstances analysis. Id. In Edwards, the Ohio Supreme Court held that the defendant's confession was voluntary, despite a "promise" made by police that the court would be "lenient" with him if he told the truth. Id.
[7] {¶ a} In Loza, the court first defined the narrow issue before it as whether expert psychological testimony about the voluntariness of a confession should have been admitted during the guilt phase of a trial. The Ohio Supreme Court then stated that the expert's testimony would have addressed "police coercion and duress" during the interrogation. Immediately thereafter, however, the court indicated that the expert would have testified that the confession was attributable to the defendant's own background, psychological makeup, and code of honor — matters which do not appear to involve police coercion or duress. The Loza court then attempted to distinguish Crane. In so doing, it noted that Crane involved testimony about the impact the physical andpsychological environment of the confession had on its voluntariness andcredibility, whereas Loza involved testimony only about how the defendant's psychological makeup impacted the voluntariness andcredibility of his confession, without regard to "the circumstances surrounding the confession." Finally, the Ohio Supreme Court appears to have found Crane to be distinguishable, insofar as the jury in Loza was capable of assessing the defendant's credibility by watching a videotape of his confession.
{¶ b} With all due respect to the Ohio Supreme Court, the nature of the expert's proposed testimony in Loza is not entirely clear. In addition, as we will explain more fully, infra, the legal significance of the factual distinction drawn by the Ohio Supreme Court between Loza andCrane is not apparent to us. Furthermore, the Loza court's analysis is unclear as to whether the specific issue in that case was the admissibility of expert testimony about the voluntariness of a confession, the reliability of a confession, or both. In any event, at the outset of its opinion, the Loza court expressly framed the issue raised by the appellant as whether expert psychological testimony about the voluntariness of a confession should have been admitted during the guilt phase of a trial. Upon review, we presume that the Ohio Supreme Court meant what it said. Accordingly, we read Loza as holding only that expert psychological testimony about the voluntariness of a confession should not be admitted during the guilt phase of a trial. Insofar as the State or the trial court may have read Loza as standing for the broader proposition that an expert may not testify about psychological diagnoses which tend to render a confession unreliable, we decline to adopt such a broad reading of the Ohio Supreme Court's opinion. As will be explained more fully, infra, reading Loza in such a manner, and excluding Mossman's proposed testimony on that basis, would, in our view, violate Stringham's constitutional right to present a defense. Accordingly, we adopt the narrower reading of Loza's holding that we have stated above.
[8] In the present case, the only other evidence against Stringham was one fingerprint found in the victim's car. Absent Stringham's confession, we believe the State would have had a difficult time obtaining a first-degree murder conviction.
[9] In Crane, 476 U.S. at 690, the Supreme Court also recognized that testimony bearing on the credibility of a confession must be competent and reliable in order to be admissible. In the present case, however, we will assume arguendo that Mossman's testimony was competent and reliable. We will indulge in such an assumption because the trial court did likewise. In excluding Mossman's proposed testimony, the trial court did not make any finding that the testimony was unreliable or otherwise inadmissible under a Daubert-type analysis or under the Ohio Rules of Evidence. To the contrary, the trial court expressly assumed for purposes of its ruling that Mossman was sufficiently qualified as an expert. Trial Tr. Vol. III at 511. The trial court also assumed, based on Mossman's representations, that "there is a valid scientific principle concerning individuals who may admit to things they didn't necessarily commit[.]" Id. at 522; see also id at 523 (assuming the existence of general, scientifically supported principles concerning individuals who make false confessions). In light of the foregoing assumptions, we have no occasion to decide whether Mossman's testimony was competent and reliable, as the trial court did not exclude it on the basis of incompetence or unreliability.
[10] As noted, supra, the trial court made no finding that Mossman's testimony was incompetent or unreliable. Consequently, for present purposes we have no occasion to address such issues, which are not before us.
[11] {¶ a} In Miller, the appellate court acknowledged that jurors did not need expert testimony to understand that someone could be lying. The court noted, however, that the expert "was prepared to testify not just that people can lie but how and why someone could make a falsely incriminatory statement." The Miller court reasoned that the substance of this "expert testimony would not have been within the common understanding of the jurors, and thus would have been helpful." See alsoUnited States v. Shay (1st Cir. 1995), 57 F.3d 126, 133 ("Common understanding conforms to the notion that a person ordinarily does not make untruthful inculpatory statements."); United States v. Hall (7th Cir. 1996), 93 F.3d 1337, 1345 ("It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making its decision [as to the reliability of the defendant's confession.]").
{¶ b} Likewise, in the present case it does not appear that Mossman would have testified about lying in general. Rather, he anticipated testifying about false confessions and, more particularly, how and why someone with Stringham's diagnoses, which included psychotipal personality disorder, would have been particularly susceptible to making a false confession. The impact that a psychotipal personality disorder has on the reliability of a confession is not within the common understanding of most jurors. Consequently, it appears that Mossman's expert testimony would have assisted the jurors in assessing whether Stringham's confession was worthy of belief. In any event, the trial court did not exclude Mossman's proposed testimony on the basis that it was within the common understanding of most jurors or that it would not assist jurors in understanding why Stringham confessed to a crime that he did not commit.
[12] We note that this list of case law is illustrative only and far from exhaustive.
[13] As set forth above, the Crane Court recognized that testimony about the "physical and psychological environment that yielded the confession" may have a significant impact on its reliability. While evidence concerning the "physical environment" of a confession is easy to identify, the "psychological environment" that yields a confession is less concrete. In our view, the psychological environment that yields a confession undoubtedly encompasses the atmosphere created by the conduct
of one's interrogators. At the same time, this atmosphere does not arise in a vacuum, and it depends, at least in part, on how the witnessperceives the interrogators' conduct. Stated differently, for purposes of determining the reliability of a confession, the "psychological environment" of a confession necessarily must encompass the perceptions of the person being questioned, as witnesses will perceive the conduct of their interrogators differently and react differently based on their own psychological profiles. Consequently, we discern no reason why Stringham's own psychological traits, diagnoses, or characteristics would not constitute part of the "psychological environment" that yielded his confession.
[14] In its appellate brief, the State insists that the jury needed no help in assessing the reliability of Stringham's confession, as it was able to see and to hear the interrogation that resulted in his confession. See Appellee's Brief at 7. In the present case, however, Mossman did not propose to testify exclusively about the observable, physical environment in which Stringham confessed. Rather, Mossman proposed to testify primarily about psychological reasons why a person would give a voluntary but false confession. As noted above, Mossman's proposed testimony concerned the peculiar phenomenon of individuals telling voluntary lies to implicate themselves in crimes that they did not commit. Seeing and hearing the manner in which the police interrogated Stringham would not reveal this information to the jury.
[15] We recognize, of course, that expert testimony must meet the requirements of Evid.R. 702. In particular, such testimony must (1) either relate to matters beyond the knowledge or experience possessed by lay persons or dispel a misconception common among lay persons, (2) be provided by a witness who is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and (3) be based on reliable scientific, technical, or other specialized information. As noted elsewhere in this opinion, the trial court made no explicit findings as to the foregoing requirements. Rather, the trial court appears to have assumed, for purposes of its written ruling, that Mossman's testimony satisfied the foregoing requirements, as his testimony was not excluded on the basis of Evid.R. 702. Instead, the trial court appears to have found that Mossman's proposed testimony was not relevant, insofar as it concerned the voluntariness of Stringham's confession and was inadmissible under Loza, and also that it constituted an improper comment on Stringham's veracity. Given that the trial court has not ruled on the admissibility of Mossman's proposed expert testimony under Evid.R. 702, we leave that issue for the trial court to address on remand if it should arise.
[16] Parenthetically, we note that none of the statements made by the three jail inmates were used against Stringham at trial.